SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized).

## Ramon Cuevas v. Wentworth Group (A-30-14) (075077)

**Argued March 15, 2016 -- Decided September 19, 2016**

**ALBIN, J., writing for a unanimous Court.**

At issue is whether the trial court properly denied defendants' remittitur motion.

Plaintiffs Ramon and Jeffrey Cuevas are brothers who were employees of defendant Wentworth Property Management Corporation (Wentworth). In May 2005, Michael Mendillo, president and chief executive officer of Wentworth, hired Ramon to serve as a regional vice president -- the only one of Hispanic descent. In December 2005, Wentworth hired Ramon's brother Jeffrey as a portfolio manager. Jeffrey was promoted to executive director in July 2007. In the new position, Jeffrey reported directly to defendant Arthur Bartikofsky, Wentworth's executive vice president of operations. Ramon also reported to Bartikofsky.

Plaintiffs claim that they encountered racial discrimination and a hostile work environment while under Bartikofsky's supervision. Many of the degrading remarks directed at Ramon occurred at senior executive meetings, where Mendillo, Bartikofsky, Alan Trachtenberg (in-house counsel), other executives, and regional vice presidents were present. For example, Ramon recalled that when lunch was served, Bartikofsky, and others, would comment about the lack of "Mexican restaurants in the area" and the inability to "get burritos or tacos." When Ramon talked about his cat, someone quipped, "I figured you had a little Taco Bell Chihuahua dog." Jeffrey corroborated most of his brother's account. When Jeffrey complained to Trachtenberg, he replied that Jeffrey should "calm down" and that the remarks should not be taken "so seriously."

Within the next month, both Ramon and Jeffrey were terminated. Plaintiffs filed an action under New Jersey's Law Against Discrimination (LAD) claiming that they were victims of race-based discrimination, a hostile work environment, and retaliatory firings. Ramon also claimed that Wentworth failed to promote him based on his race. In its defense, Wentworth contended that plaintiffs were terminated for poor work performance. Mendillo and Bartikofsky, as well as other Wentworth employees, testified that they neither made nor heard any racially inappropriate remarks concerning plaintiffs. The case was tried before a jury, which returned a verdict against defendants on all claims other than Ramon's failure-to-promote claim. The jury awarded overall damages in the amount of $2.5 million to the two brothers, including $800,000 in emotional-distress damages to Ramon and $600,000 in emotional-distress damages to Jeffrey. The trial court rejected defendants' post-trial motions to vacate the jury's verdict and the damages award. In particular, the court denied defendants' motion for a remittitur of the emotional-distress damages. In doing so, the court distinguished the comparable cases and verdicts selected by defendants. In the court's view, the award fell far short of one that would be shocking to the conscience. The trial judge also stated that she would refrain from applying her own feel for the case under He v. Miller, 207 N.J. 230 (2011).

Defendants appealed. In an unpublished opinion, a panel of the Appellate Division affirmed the emotional-distress damages awards essentially for the reasons expressed by the trial court. The panel rejected defendants' argument that, in a LAD case, only nominal damages may compensate for emotional distress when there is no independent corroborative proof or a showing of resulting physical or psychological symptoms. It maintained that, in a discrimination case, a plaintiff may recover damages for emotional distress and mental anguish damages arising out of embarrassment, humiliation, and other intangible injuries without accompanying medical proof. The Court granted defendants' petition for certification limited to the issue of whether the trial court erred in denying defendants' request for remittitur. 220 N.J. 266 (2015).

**HELD:** A judge should not rely on personal knowledge of other verdicts or comparative-verdict methodology when deciding a remittitur motion. In this case, the trial judge did not rely on personal knowledge of other verdicts or comparable verdicts presented by the parties in deciding the remittitur motion, but rather on the record before her. The denial of remittitur here conforms to the deferential standard of review of a jury's award of damages.

1. When a court is persuaded that a new trial must be granted based solely on the excessiveness of the jury's damages award, it may enter a remittitur reducing the award to the highest amount that could be sustained by the evidence. The plaintiff may either accept the award as remitted by the court or proceed with a new damages trial before another jury. Courts must exercise the power of remittitur with great restraint because the jury is charged with the responsibility of deciding the merits of a civil claim and the quantum of damages to be awarded. Determining an award that properly compensates an accident victim for pain and suffering or the victim of racial discrimination for emotional distress is not susceptible to scientific precision. A permissible award may fall within a wide spectrum of acceptable outcomes. (pp. 22-24)

2. A jury's verdict is cloaked with a presumption of correctness. That presumption is not overcome unless a defendant can establish, clearly and convincingly, that the award is a miscarriage of justice. In deciding whether to grant a new trial or remittitur, the court must give due regard to the opportunity of the jury to pass upon the credibility of the witnesses. A court must view the evidence in the light most favorable to the plaintiff. The standard for reviewing a damages award that is claimed to be excessive is the same for trial and appellate courts, with one exception -- an

appellate court must pay some deference to a trial judge's "feel of the case." That is because it is the judge who sees the jurors wince, weep, snicker, avert their eyes, or shake their heads in disbelief, who may know whether the jury's verdict was motivated by improper influences, and who may be privy to observations that could not have been made by the jury. (pp. 24-26)

3. Here, the trial judge said she would refrain from applying her own feel of the case. Apparently, she was reluctant to assess whether the jury returned an excessive damages award based on her personal experiences as a practicing attorney or as a judge. The trial judge made the right decision by not injecting her own experiences as a benchmark for evaluating the damages award. She observed that the jurors were attentive throughout the trial, understood their charge, and carefully apportioned and set the amount of punitive damages. She concluded that the jury had the opportunity to assess the testimony of all witnesses and that the jury evidently found plaintiffs to be more credible. The Court agrees with defendants that the trial judge's findings are not entitled to any special deference, but also agrees with the trial judge that the jury's findings must be accorded deference. (pp. 26-27)

4. In He, supra, the Court expressed approval of a trial judge relying on his own experience with personal-injury verdicts as a litigator and judge in determining whether a pain-and-suffering award returned by a jury shocked the judicial conscience. That approach may have been suggested by prior case law. However, the Court now concludes that a trial judge's reliance on her personal experiences as a practicing attorney or jurist in deciding a remittitur motion is not a sound or workable approach. The shock-the-judicial-conscience standard is objective and transcends any individual judge's personal experiences. If the trial judge's personal experiences as a private practitioner and jurist were to be given weight in deciding a remittitur motion, then the same collective experiences of the appellate judges and Supreme Court Justices engaged in a de novo review would likewise be given weight. If that standard applied, then, arithmetically, the experiences of seven members of this Court would always outweigh those of a single trial judge. To the extent possible, judges must administer an objective judicial standard. Accordingly, a judge's personal experiences with seemingly similar cases while in practice and on the bench are not relevant in deciding a remittitur motion. (pp. 27-31)

5. The comparison of supposedly similar verdicts to assess whether a particular damages award is excessive is a futile exercise that should be abandoned. Courts should focus their attention on the record of the case at issue in determining whether a damages award is so grossly excessive that it falls outside of the wide range of acceptable outcomes. The facts and plaintiffs in every personal-injury or LAD case are fundamentally different and therefore a true comparative analysis is illusory. The accounts of jury verdicts reported in the New Jersey Law Journal and other publications, and even unreported decisions of the Appellate Division, are just summaries. Summaries cannot compare to what a jury hears from a witness on the stand. Juries and judges will often have different opinions about what constitutes a sufficient monetary award to compensate a victim for pain and suffering following a tortious injury. The realization that a wide range of potential awards is permissible counsels for judicial restraint. At oral argument before this Court, counsel suggested that attorneys are inundating trial courts with comparable verdicts on remittitur motions. Having trial courts review snippets of information about cases that are not truly comparable is not a worthwhile use of judicial resources, nor likely to bring greater justice to either plaintiffs or defendants. Therefore, the Court disapproves of the comparative-case analysis in deciding remittitur motions. Judges know the nature of emotional distress and the function of money and that correlating the two to arrive at a fair and reasonable award of damages requires a high order of human judgment. In the end, a thorough analysis of the case itself; of the witnesses' testimony; of the nature, extent, and duration of the plaintiff's injuries; and of the impact of those injuries on the plaintiff's life will yield the best record on which to decide a remittitur motion. (pp. 31-39)

6. The Court agrees that the trial court properly denied defendants' remittitur motion. Because of the special harm caused by willful discrimination in the workplace, compensatory damages for emotional distress, including humiliation and indignity, are remedies that require a far less stringent standard of proof than that required for a tort-based emotional distress cause of action. Plaintiffs in this case were entitled to recover all natural consequences of defendants' wrongful conduct, including emotional distress and mental anguish damages arising out of embarrassment, humiliation, and other intangible injuries. Plaintiffs did not offer expert testimony to buttress their emotional-distress damages claims, and because they did not do so, the court correctly did not charge the jury on emotional-distress damages projected into the future. Although both plaintiffs held important positions at Wentworth, they were referred to as Chihuahuas, Latin lovers, and the "Rico Suave brothers." The mental anguish and humiliation here were sustained over a long period, and were not fleeting or insubstantial. Although these awards are probably on the high end, they were not so wide of the mark that they shock the judicial conscience. (pp. 39-42)

The judgment of the Appellate Division, which upheld the trial court's denial of defendants' remittitur motion, is **AFFIRMED**.

**CHIEF JUSTICE RABNER; JUSTICES LaVECCHIA, PATTERSON, FERNANDEZ-VINA, and SOLOMON; and JUDGE CUFF (temporarily assigned) join in JUSTICE ALBIN's opinion.**

RAMON CUEVAS and JEFFREY
CUEVAS,

    Plaintiffs-Respondents,

        v.

WENTWORTH GROUP, WENTWORTH
PROPERTY MANAGEMENT
CORPORATION, and ARTHUR
BARTIKOFSKY,

    Defendants-Appellants.


        Argued March 15, 2016 – Decided September 19, 2016

        On certification to the Superior Court, Appellate Division.

        John D. North argued the cause for appellants (Greenbaum, Rowe, Smith & Davis, attorneys; Mr. North, Paul A. Rowe, Gary K. Wolinetz, and Maja M. Obradovic, on the briefs).

        Darren J. Del Sardo argued the cause for respondent Ramon Cuevas (Damico, Del Sardo & Montanari, attorneys; Mr. Del Sardo and Jayna B. Patel, on the brief).

        John J. Piserchia argued the cause for respondent Jeffrey Cuevas.

        Natalie H. Mantell argued the cause for amicus curiae New Jersey Defense Association (Gibbons, attorneys; Ms. Mantell, Christine A. Amalfe, Suzanne H. Brock, and Mario J. Delano, of counsel and on the brief).

Amos Gern argued the cause for amicus curiae New Jersey Association for Justice (Starr, Gern, Davison & Rubin, attorneys; Mr. Amos and Robert C. Sanfilippo, on the brief).

Richard M. Schall argued the cause for amicus curiae National Employment Lawyers Association of New Jersey (Schall & Barasch, attorneys).

JUSTICE ALBIN delivered the opinion of the Court.

The preeminent role that the jury plays in our civil justice system calls for judicial restraint in exercising the power to reduce a jury's damages award. A court should not grant a remittitur except in the unusual case in which the jury's award is so patently excessive, so pervaded by a sense of wrongness, that it shocks the judicial conscience.

In He v. Miller, 207 N.J. 230 (2011), this Court restated familiar principles that animate our remittitur jurisprudence. The He Court expressed that a jury verdict is presumed to be correct and entitled to substantial deference, that the trial record underlying a remittitur motion must be viewed in the light most favorable to the plaintiff, and that the judge does not sit as a decisive juror and should not overturn a damages award falling within a wide acceptable range -- a range that accounts for the fact that different juries might return very different awards even in the same case.

At issue in this case are not those fundamental principles governing remittitur jurisprudence, but rather how those

2

principles found expression in the He decision. The He Court held that a trial judge could rely on both his personal knowledge of verdicts as a practicing attorney and jurist and "comparable" verdicts presented by the parties in deciding a remittitur motion.

Although this Court's pre-He decisions may have opened the door to a judge's reliance on personal knowledge of other verdicts and on purportedly comparable verdicts presented by the parties in deciding whether to remit a pain-and-suffering damages award, we now conclude that such an approach is not sound in principle or workable in practice.

A judge's personal knowledge of verdicts from experiences as a private practitioner or jurist is information outside the record and is not subject to the typical scrutiny evidence receives in the adversarial process. The cohort of cases within a judge's personal knowledge may not be statistically relevant and the reliability of the judge's knowledge cannot be easily tested. A judge therefore should not rely on personal knowledge of other verdicts. The standard is not whether a damages award shocks the judge's personal conscience, but whether it shocks the judicial conscience.

We also disapprove of the comparative-verdict methodology that allows parties to present supposedly comparable verdicts based on case summaries. The singular facts and particular

3

plaintiffs in different cases that lead to varying awards of damages are not easily susceptible to comparison. That is especially so because the information about other seemingly similar verdicts is very limited. A true comparative analysis would require a statistically satisfactory cohort of cases and detailed information about each case and each plaintiff. That information is unlikely to be available, and therefore any meaningful comparative approach would be impracticable to implement.

With those constraints in mind, remittitur remains a judicial remedy to correct a grossly disproportionate damages award, which, if left intact, would constitute a miscarriage of justice.

In this case, the trial court denied a remittitur motion to reduce the jury's award of emotional-distress damages to two victims of workplace discrimination. The trial judge did not rely on personal knowledge of other verdicts or comparable verdicts presented by the parties in deciding the remittitur motion but rather on the record before her.

The Appellate Division upheld the emotional-distress damages award, and we affirm. The denial of remittitur here conforms to the deferential standard of review of a jury's award of damages.

I.

4

Plaintiffs Ramon and Jeffrey Cuevas are brothers who were employees of defendant Wentworth Property Management Corporation (Wentworth). During their employment at Wentworth, plaintiffs claim that they were routinely subject to racially disparaging and humiliating remarks by Wentworth executives, and particularly by Arthur Bartikofsky, Wentworth's executive vice president of operations. They contend that after complaining about this debasing treatment, they were terminated from their employment.

Plaintiffs filed an action under New Jersey's Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49, claiming that they were victims of race-based discrimination, a hostile work environment, and retaliatory firings. Ramon additionally claimed that Wentworth failed to promote him based on his race in violation of the LAD. Named as defendants in this action are Wentworth, the Wentworth Group (the parent company), and Bartikofsky.

The case was tried before a jury, which returned a verdict against defendants on all claims other than Ramon's failure-to-promote claim. The jury awarded overall damages in the amount of $2.5 million to the two brothers, including $800,000 in emotional-distress damages to Ramon and $600,000 in emotional-distress damages to Jeffrey. The trial court denied defendants' motion for a remittitur of the emotional-distress damages, and

5

the Appellate Division affirmed.  The only issue before this Court is whether the trial court properly denied the remittitur motion.

Judicial review of the correctness of a jury's damages award requires that the trial record be viewed in the light most favorable to plaintiffs.  Besler v. Bd. of Educ. of W. Windsor-Plainsboro Reg'l Sch. Dist., 201 N.J. 544, 577 (2010).  We present the facts in accordance with that deferential standard.

A.

Wentworth is a property-management company, and the Wentworth Group is the parent entity.  Michael Mendillo was the president and chief executive officer of Wentworth and the owner of the Wentworth Group.  In May 2005, Mendillo hired Ramon to serve as one of Wentworth's regional vice presidents -- the only one of Hispanic descent.  In that role, Ramon managed high-rise buildings and townhouse developments.  Over time, Ramon's role grew from managing nine to eventually twenty-four properties.

In December 2005, Wentworth hired Ramon's brother Jeffrey as a portfolio manager overseeing six Wentworth properties.  Jeffrey's success in that position led to his promotion to executive director in July 2007.  In that new position, Jeffrey reported directly to defendant Bartikofsky, who several months earlier had begun supervising Ramon.  According to Ramon, Wentworth was "thrilled" with the profits and growth that he

6

brought to the company, that is, before Bartikofsky became his supervisor.

Plaintiffs claim that they encountered racial discrimination and a hostile work environment during Bartikofsky's supervisory reign over them. During this period, they routinely faced biting remarks that invoked racially demeaning stereotypes. Many of the degrading remarks directed at Ramon occurred at senior executive meetings. Present at those meetings were Mendillo, Bartikofsky, Alan Trachtenberg (in-house counsel), other executives, and regional vice presidents.

Ramon recalled that when lunch was served at meetings, Bartikofsky, and others, would comment about the lack of "Mexican restaurants in the area" and the inability to "get burritos or tacos." At a meeting when music was played, someone interjected, "Do you think we could get a little Mariachi or salsa music in the background" -- "something a little more to Ramon's taste?" At a conference to discuss entertainment, a participant chimed in that Ramon should look through his Rolodex because he might know "a salsa band, a Mariachi band that can perform." Although Ramon attempted to deflect these hurtful comments, he was embarrassed, particularly when they were made in the company of people he supervised.

7

At one meeting at a restaurant, one of the participants joked that a Hispanic busboy looked like Ramon's "twin" brother. On such an occasion, Bartikofsky stated that if he did not pick up the check, "Ramon can join his father [in the back] and you guys can wash dishes."  In such an instance, Ramon explained he would offer a comeback line, such as "[M]y dad happens to have his own business," but if you need help with the check, "I have my credit card."  On some occasions, however, he did not want to sound defensive and said nothing, and on other occasions he said, "Enough."

The abuse, however, continued.  When Ramon came to the office explaining that he had to fix a flat tire, someone suggested that if a "Puerto Rican" were observed with a crowbar kneeling by a car, he might be mistaken as "trying to steal the car or the hubcaps."  When Ramon talked about his cat, someone quipped, "I figured you had a little Taco Bell Chihuahua dog." After a networking event in Newark, a person stated, "I'm going to walk with Ramon . . . because he's with his people, and . . . I'm sure he has a switchblade[.]"  Two former property managers for Wentworth testified that Bartikofsky made comments that they would be safe in bad neighborhoods when accompanied by Ramon because "he's one of them" and because he was "Spanish."

Ramon testified that the stream of belittling remarks "chopped [him] down day by day, month by month," leaving him

"feeling helpless."  Instead of focusing on his accomplishments, the Wentworth executives turned him into a punch line.  He did not file a formal complaint because the offensive remarks were made by or in the presence of senior executives in the company, including the company's president, the executive vice president, the human resources officer, and the in-house counsel.  Ramon felt he had nowhere to go and was afraid of losing his livelihood and insurance coverage.

Jeffrey corroborated much of his brother's account. Jeffrey testified that Wentworth executives made many ethnically disparaging remarks about his Hispanic heritage.  According to Jeffrey, the executives joked that they would have to order twice as much Mexican food and hire a salsa band because of plaintiffs.  In addition, they referred to Ramon and Jeffrey as the two Chihuahuas.  Jeffrey stated that Bartikofsky called Ramon and him the "Rico Suave brothers," and that Darlene Rasmussen, the director of human resources, referred to them as "Latin lover[s]."[1]  To his mind, that last remark was particularly "grotesque" and demeaning because it came from the human resources director.

---

[1] "Rico Suave" is a song performed by Gerardo that describes the tribulations of a "Latin lover."  Gerardo, Rico Suave, on Mo'Ritmo (Interscope 1991).

9

By November 30, 2007, Jeffrey had reached his boiling point. On that day, he told Trachtenberg, the in-house counsel, "I really would like it if those comments at these executive meetings could stop." In speaking with Trachtenberg, Jeffrey described the repetitive offensive remarks as "silly," "childish," and "degrading." Trachtenberg replied that Jeffrey should "calm down" and that the remarks were "good[-]natured ribbing," not "that big a deal," and should not be taken "so seriously." Jeffrey made it clear that he and his brother took the matter seriously and wanted the harassing behavior to end, and warned, "I'd really rather not have to take this to the next level."[2]

Four days later, on December 4, Bartikofsky and Wentworth's vice president of business development walked into Jeffrey's office and fired him. Shocked, Jeffrey responded that he was given a performance-based raise of $10,000 just four weeks earlier. Bartikofsky stated that "the company [was] going in a different direction" and ordered him to clear out his desk and leave the premises immediately.

Ramon was "stupefied" to learn of his brother's firing. Ramon called Mendillo to complain about the lack of "process" in the decision to terminate Jeffrey.

---

[2] Trachtenberg denied that Jeffrey ever complained to him.

10

On New Year's Day 2008, Ramon received a telephone call from Bartikofsky, who said that they needed to meet at the Cheesequake Rest Area located off the Garden State Parkway. Ramon dutifully went there. On his arrival, Bartikofsky, accompanied by a Wentworth associate, walked up to Ramon and handed him an envelope. Bartikofsky told Ramon not to "bother sitting down, you're terminated." The letter inside the envelope indicated that Ramon was fired for losing five accounts and for soliciting a kickback from one of Wentworth's vendors. Ramon denied any involvement in a kickback scheme and indicated he had never received a reprimand while employed at Wentworth.

Ramon and Jeffrey testified concerning the emotional distress they suffered as a result of the workplace harassment and the retaliatory firings.

Ramon stated that, while working at Wentworth, he felt "beaten down," "despondent," and a loss of self-confidence. He was too "embarrassed" to discuss the daily humiliations with his wife, and he became edgy, and the two would fight. Just months after Wentworth fired him, his wife filed for divorce. After his termination, he became depressed and worried about his financial security and the effect the firing would have on his reputation. Ramon, however, never received treatment from a mental health professional.

11

Jeffrey testified that the shabby treatment he received at Wentworth was "extremely degrading," affected his "psyche," and ruined his "self-confidence." He questioned whether people would judge him based on his skills and ability or merely based on his nationality and skin color. He expressed that the firing tarnished his reputation and that he felt as though he was "limping" his way through life. He described the firing as "so humiliating, so embarrassing" and recalled the pain of returning home to his wife and daughter, just weeks before Christmas, without a job to support his family. He fell into a depression but did not seek mental-health counseling.

In its defense, Wentworth contended that plaintiffs were terminated for poor work performance. Mendillo, however, could not produce any documents to substantiate his claim that Wentworth had received client complaints about Ramon. Mendillo also disputed that Jeffrey's pay raise -- given just weeks before his termination -- was performance related. Mendillo also asserted that Ramon's termination was based on his solicitation of a kickback from one of its vendors, Premier Security. The former vice president of that company testified that Ramon sought a percentage from Premier's account for work with Wentworth.

Mendillo and Bartikofsky, as well as other Wentworth employees, testified that they neither made nor heard any

racially inappropriate remarks concerning plaintiffs. Mendillo stated that twenty percent of Wentworth's employees and forty percent of Wentworth Group's employees were Hispanic. He denied that Hispanic employees were subject to discrimination.

## B.

The jury returned a verdict in favor of plaintiffs on their racial discrimination, hostile-work-environment, and retaliation claims, but found against Ramon on his failure-to-promote claim.

The jury awarded Ramon $632,500 for past lost earnings; $400,000 for future lost earnings; $800,000 in emotional-distress damages; and $52,500 in punitive damages ($50,000 allocated to Wentworth and $2500 allocated to Bartikovsky). The court also awarded Ramon $253,284 in attorneys' fees and costs.

The jury awarded Jeffrey $150,000 for past lost earnings; $600,000 in emotional-distress damages; and $32,500 in punitive damages ($30,000 allocated to Wentworth and $2500 allocated to Bartikovsky). The court also awarded Jeffrey $276,243 in attorneys' fees and costs, and an additional $6213 to account for the negative tax impact resulting from Jeffrey's back-pay award.

The trial court rejected defendants' post-trial motions to vacate the jury's verdict and the damages award. In particular, the court denied defendants' motion for a remittitur of the emotional-distress damages awarded to plaintiffs. In doing so,

13

the court distinguished the "comparable" cases and verdicts selected by defendants. The court began its analysis with the presumption of correctness that attaches to a jury verdict. The court determined that, given the evidence presented, the emotional-distress damages award did not shock the judicial conscience and dismissed the notion that this was "a case of a runaway jury." In the court's view, the award fell far short of one that would be "shocking to the conscience."

The court observed that the jury was composed of seven individuals of diverse backgrounds, who were "extremely attentive throughout the trial" and who "fully understood" their charge. It pointed out that the jury failed to find in favor of Ramon's failure-to-promote claim and acted reasonably in apportioning and fixing an amount for punitive damages. The court noted that both the court and the jury "had the opportunity to observe both plaintiffs and assess their credibility." Both plaintiffs, according to the court, "presented extremely well. They appeared to be genuine, earnest, and credible in their presentation of their testimony. They were articulate and extremely well spoken." According to the court, the verdict indicated that "the jury found plaintiffs to be more likely than not credible."

The trial judge stated that she would "refrain from applying [her] own feel for the case under He v. Miller." She

14

explained: "I've been a proud member of the judiciary for only a year and a half, which I believe hardly leaves me in a position where I can appropriately apply my feel of the case." She expressed that she was certainly "qualified to hear this case" and, in fact, had handled a number of LAD cases as an attorney practicing in the field of labor and employment law. Nevertheless, she concluded, "I simply do not think that as a judge I can apply . . . my feel for the case."

Defendants appealed.

### C.

In an unpublished opinion, a panel of the Appellate Division affirmed the emotional-distress damages awards essentially for the reasons expressed by the trial court.[3] The panel rejected defendants' argument that, in a LAD case, only nominal damages may compensate for emotional distress when there is no "independent corroborative proof or a showing of resulting physical or psychological symptoms." It emphasized that "the Legislature intended victims of discrimination to obtain redress

---

[3] The panel also addressed a number of issues that are not relevant to the appeal before this Court. The panel entered a judgment in favor of defendants on Jeffrey's back-pay award, notwithstanding the verdict. The panel also vacated Ramon's back- and front-pay awards and remanded for a new trial on those claims. Additionally, the panel remanded the issue of counsel fees and costs to await the outcome of the new trial. The panel affirmed the punitive-damages award.

for mental anguish, embarrassment, and the like, <u>without limitation to severe emotional or physical ailments</u>," quoting <u>Tarr v. Ciasulli</u>, 181 <u>N.J.</u> 70, 81 (2004).

The panel explained that the standard of proof for recovering emotional-distress damages in discrimination cases is less stringent than the standard for recovering such damages in a common-law intentional-infliction-of-emotional-distress case. It maintained that, in a discrimination case, a plaintiff may recover damages for "'emotional distress and mental anguish damages arising out of embarrassment, humiliation, and other intangible injuries' without accompanying medical proof," quoting <u>Tarr</u>, <u>supra</u>, 181 <u>N.J.</u> at 82. Thus, according to the panel, plaintiffs were entitled to a recovery on their emotional-distress claims, even in the absence of medical or expert testimony supporting those claims.

Last, the panel noted that, "[d]espite the myriad of cases cited by defendants where courts reduced damage awards in discrimination cases, the Supreme Court has cautioned against engaging in such comparisons and ruled that the Appellate Division 'must refrain from merely substituting its differing opinion without appropriate deference to the trial court[,]'" quoting <u>He</u>, <u>supra</u>, 207 <u>N.J.</u> at 236. Although the panel acknowledged that the emotional-distress damages awards were

16

"generous," the awards were not "so excessive or so high as to shock the judicial conscience."

We granted defendants' petition for certification "limited to the issue of whether the trial court erred in denying defendants' request for remittitur." Cuevas v. Wentworth Grp., 220 N.J. 266 (2015).[4] We also granted the motions of the New Jersey Defense Association, the National Employment Lawyers Association of New Jersey, and the New Jersey Association for Justice to participate as amici curiae.

## II.

## A.

Defendants contend that the trial court and Appellate Division erred in not granting their remittitur motion on the emotional-distress damages. First, they argue that the "insensitive" remarks attributed to Wentworth's personnel were just "teasing" and "joking" and not "the type of behavior that constitutes harassment and merits damages."

Second, they maintain that, by failing to consider comparable verdicts, the trial court did not follow the dictates of He, supra, 207 N.J. 230. Defendants also fault plaintiffs for not attempting to distinguish "the numerous decisions cited

---

[4] We declined to grant certification on a number of other issues raised by defendants in their petition. See Cuevas, supra, 220 N.J. 266. We also denied plaintiffs' cross-petition for certification. Cuevas v. Wentworth Grp., 220 N.J. 269 (2015).

by Wentworth where [excessive] emotional distress awards were vacated or remitted" and for not pointing to any comparable LAD award.

Third, defendants suggest that because the trial judge refrained from "imparting her 'feel of the case,'" her ruling should be accorded less deference. In this light, defendants insist that "the brevity of the trial judge's experience [made] the comparison to similar cases . . . even more important."

Last, defendants submit that the Appellate Division disregarded the mandate of He by not mentioning that comparable cases from the judge's own experience will provide guidance in determining whether a damages award shocks the judicial conscience.[5]

B.

---

[5] Despite this Court's limited grant of certification, defendants have made part of their challenge to the denial of remittitur an attack on the charge to the jury and plaintiffs' summations to which no objections were made at trial. Defendants claim that the emotional-distress damages award should be vacated because the court's instructions and plaintiffs' summations suggested that the jury could consider the permanency of the emotional harm caused to plaintiffs, even though no expert testimony supported permanent harm. Notably, defendants' attorney at trial expressly approved of the court's charge on emotional-distress damages: "[T]he court's emotional distress charge, as written by the court, accurately indicates to the jury what exactly they should be looking at when they're assessing this concept of emotional distress damages." Additionally, the Appellate Division found that any erroneous summation remarks by plaintiffs' counsel regarding the scope of emotional-distress damages were harmless and that the jury charge was correct. In any event, these issues are not before us.

Amicus New Jersey Defense Association submits that a remittitur analysis must involve a comparison of awards in similar cases found in reported and unreported opinions and published in the Law Journal's Verdict Reports to "safeguard against excessive verdicts and ensure predictability of damages in civil litigation." Amicus contends that an emotional-distress claim supported by only the testimony of the victim and family members -- and not by medical testimony -- should be limited to nominal damages. It describes the emotional-distress claims in this case as "garden variety," warranting nothing more than nominal damages, because plaintiffs did not seek medical treatment or present expert testimony to support their claims.

C.

Plaintiffs counter that this is not a case of harmless teasing or offhand comments but of actionable racial harassment and discrimination and that sufficient credible evidence in the record supports the jury's award of emotional-distress damages. Plaintiffs submit that the trial judge followed the dictates of He, supra, 207 N.J. 230, by explaining her reasons for not granting a remittitur of the jury award. Furthermore, according to plaintiffs, although the trial judge mentioned that she would not impart her "feel of the case" because of her "limited judicial experience," she, in fact, conveyed her "feel of the case" by commenting on the credibility of plaintiffs' testimony

19

and on the jury's attentiveness during the trial.  Plaintiffs urge this Court to accord deference to the trial judge's explanation for finding that the damages award did not shock the judicial conscience.

D.

Amicus National Employment Lawyers Association of New Jersey asserts that, in amending the LAD to allow recovery for emotional-distress damages caused by discrimination, the Legislature intended the remedy plaintiffs received in this case.  Amicus notes that "this Court has repeatedly upheld very significant emotional distress damage award[s]" in LAD cases, even when employees victimized by discrimination did not seek medical or psychological treatment.  Last, it argues that this is not the unusual case envisioned by He that meets the shock-the-conscience standard.

E.

Amicus New Jersey Association for Justice argues that a court's discretion to set aside a supposedly excessive award should be based on the objective record of the case.  Amicus submits that a judge's "feel of the case" should be afforded "minimal weight" and should not serve as an opportunity for a judge to substitute her observations for those that could equally be made by the jury.

Amicus also proposes that trial judges should not rely on their personal experiences in considering remittitur motions because those experiences are outside of the record and cannot be scrutinized through the adversarial process.  It maintains that the fate of a remittitur motion should not depend on the fortuity of the personal experiences of the judge sitting on the case.

Last, amicus urges this Court to abandon the practice of having trial courts rely on "similar verdicts" to assess the merits of a remittitur motion.  It contends that information relating to a comparable verdict is not part of the trial record and is typically based on such limited facts that a proper comparison is not possible.  Amicus states that a grossly excessive award will often be so glaring and obvious that a comparative-verdict methodology is unnecessary.

### III.

A court has the power to grant a remittitur of a grossly excessive damages award returned by a jury.  Here, we must give guidance to courts on the standards that will govern review of a jury's award of emotional-distress damages in deciding a remittitur motion.  We begin with a brief description of remittitur.

### A.

When a court is persuaded that a new trial must be granted based solely on the excessiveness of the jury's damages award, it has the power to enter a remittitur reducing the award to the highest amount that could be sustained by the evidence. Fertile v. St. Michael's Med. Ctr., 169 N.J. 481, 500 (2001). The plaintiff has the choice either to accept the award as remitted by the court or to proceed with a new damages trial before another jury. Id. at 491. A damages award that is so grossly excessive that it shocks the judicial conscience cannot stand, and therefore remittitur allows the parties the option of avoiding the unnecessary expense and delay of a new trial. Id. at 491-92.

Courts, however, must exercise the power of remittitur with great restraint. That is so because in our constitutional system of civil justice, the jury -- not a judge -- is charged with the responsibility of deciding the merits of a civil claim and the quantum of damages to be awarded a plaintiff. Johnson v. Scaccetti, 192 N.J. 256, 279 (2007); see also N.J. Const. art. I, ¶ 9 ("The right of trial by jury shall remain inviolate[.]"). The drafters of our Constitution placed their "trust in ordinary men and women of varying experiences and backgrounds, who serve as jurors, to render judgments concerning liability and damages." Johnson, supra, 192 N.J. at 279.

Determining an award that properly compensates an accident victim for pain and suffering or the victim of racial discrimination for emotional distress is "not susceptible to scientific precision." See ibid. There is no neat formula for translating into monetary compensation an accident victim's pain and suffering or the mental anguish of a victim of invidious racial discrimination in the workplace. See id. at 280. In a case of workplace discrimination in violation of the LAD, jurors are asked to exercise a high degree of discernment, through their collective judgment, to determine the proper measure of damages for emotional distress, which includes "embarrassment, humiliation, indignity, and other mental anguish." Model Jury Charges (Civil) § 2.36, "Past and Future Emotional Distress in an Employment Law Case" (2014). Our model jury instruction on emotional-distress damages in discrimination cases recognizes the inexact nature of calculating such damages. Jurors are informed:

> You each know from your common experience the nature of emotional distress and you also know the nature and function of money. The task of equating the two so as to arrive at a fair and reasonable award of damages requires a high order of human judgment. For this reason, the law can provide no better yardstick for your guidance than your own impartial judgment and experience.
>
> [Ibid.]

23

Although a successful plaintiff in a discrimination action "is entitled to fair and reasonable compensation for any emotional distress," ibid., "reasonable people may differ on what is fair compensation in any particular case," see Johnson, supra, 192 N.J. at 280.  Because no two juries likely will award the same damages for emotional distress in a discrimination case, a permissible award may fall within a wide spectrum of acceptable outcomes.  Within that acceptable broad range, even a seemingly high award should not be disturbed; only if the award is one no rational jury could have returned, one so grossly excessive, so wide of the mark and pervaded by a sense of wrongness that it shocks the judicial conscience, should a court grant a remittitur.  Johnson, supra, 192 N.J. at 279-83; see also Jastram v. Kruse, 197 N.J. 216, 235 (2008) ("To be sure . . . this was a high verdict, but that does not mean it was excessive.").

A jury's verdict, including an award of damages, is cloaked with a "presumption of correctness." Baxter v. Fairmont Food Co., 74 N.J. 588, 598 (1977).  The presumption of correctness that attaches to a damages award is not overcome unless a defendant can establish, "clearly and convincingly," that the award is "a miscarriage of justice." Id. at 596 (quoting R. 4:49-1(a)).  In deciding whether to grant a new trial or remittitur based on a purportedly excessive damages award, the

court must give "due regard to the opportunity of the jury to pass upon the credibility of the witnesses." He, supra, 207 N.J. at 248 (quoting R. 4:49-1). A "judge may not substitute his judgment for that of the jury merely because he would have reached the opposite conclusion; he is not a . . . decisive juror." Baxter, supra, 74 N.J. at 598 (quoting Dolson v. Anastasia, 55 N.J. 2, 6 (1969)).

Because a jury's award of damages is presumed to be correct, when considering a remittitur motion, a court must view "the evidence in the light most favorable to the plaintiff." Johnson, supra, 192 N.J. at 281 (quoting Taweel v. Starn's Shoprite Supermarket, 58 N.J. 227, 236 (1971), overruled on other grounds by Fertile, supra, 169 N.J. 481).

### B.

The standard for reviewing a damages award that is claimed to be excessive is the same for trial and appellate courts, with one exception -- an appellate court must pay some deference to a trial judge's "feel of the case." Id. at 282 (quoting Baxter, supra, 74 N.J. at 600). That is so because "[i]t is the judge who sees the jurors wince, weep, snicker, avert their eyes, or shake their heads in disbelief," Jastram, supra, 197 N.J. at 230, who may know "whether the jury's verdict was motivated by improper influences," He, supra, 207 N.J. at 250 (quoting Pellicer v. St. Barnabas Hosp., 200 N.J. 22, 58 (2009)), and who

25

may be privy to observations that could not have been made by the jury, He, supra, 207 N.J. at 255. Under the guise of "feel of the case," however, a trial judge cannot overthrow the jury's credibility determinations and findings of fact and then substitute her own. Ultimately, the jury's "feel of the case" controls the outcome of the issues in dispute. A judge's "feel of the case" based on observing a party or a witness in the courtroom is entitled to minimal weight if the jury had the same opportunity to make similar observations. Baxter, supra, 74 N.J. at 600.

In the present case, the trial judge expressed that she would "refrain from applying [her] own feel for the case under He v. Miller." By that comment, the trial judge apparently meant that she was reluctant to assess whether the jury returned an excessive damages award based on her personal experiences as a practicing attorney in the field of employment law or as a judge with eighteen months' service on the bench. For reasons we will discuss, the trial judge made the right decision by not injecting her own professional experiences as a benchmark for evaluating the correctness of the damages award.

Although eschewing the term "feel of the case," the trial judge observed that the jurors were "extremely attentive throughout the trial," "fully understood" their charge, and carefully apportioned and set the amount of punitive damages.

26

She also remarked that plaintiffs "presented extremely well," appearing "genuine, earnest, and credible." Most importantly, perhaps, the judge concluded that the jury had the opportunity to assess the testimony of all witnesses and that the jury evidently found plaintiffs to be more credible.

We agree with defendants that the trial judge's findings are not entitled to any special deference. That would be so even had the trial judge characterized her findings as "feel of the case." But we also agree with the trial judge that the jury's findings must be accorded deference.

We now turn to the issue of whether the trial judge's personal experiences with seemingly comparable cases should play any role in deciding a remittitur motion.

C.

In He, supra, the Court expressed approval of a trial judge relying on his own experience with personal-injury verdicts as a litigator and judge in determining whether a pain-and-suffering award returned by a jury shocked the judicial conscience. 207 N.J. at 256, 258-59. Although that approach may have been suggested by prior case law, see, e.g., Johnson, supra, 192 N.J. at 281 ("[T]he court may rely on its knowledge of other injury verdicts[.]"), we now conclude that a trial judge's reliance on her personal experiences as a practicing attorney or jurist in

27

deciding a remittitur motion is not a sound or workable approach.

As already mentioned, a jury's damages award should not be overturned unless it "shock[s] the judicial conscience." Johnson, supra, 192 N.J. at 281. An award that shocks the judicial conscience is one that is "wide of the mark," "pervaded by a sense of wrongness," ibid. (quoting Baxter, supra, 74 N.J. at 598-99), and "manifestly unjust to sustain," ibid. The shock-the-judicial-conscience standard is objective in nature and transcends any individual judge's personal experiences. See Baxter, supra, 74 N.J. at 597-98. That is a notion that Chief Justice Hughes conveyed in addressing this subject:

> [A]ll judges, whether trial or appellate, are human and . . . the judgment of each is inevitably affected by subjective prejudices or predispositions relating to properties or specific tendencies of the individual mind, as distinguished from general or universal experience. These natural subjective inclinations derive from the particular background or experience of the individual judge, whether from tenure on the bench in examining or recalling other cases, from previous activity in law practice in diverse fields or, for that matter, from any human experience, such as a youthful background of poverty or wealth or the like. Such individuality of approach extends of course to the field of admeasuring damages flowing from injuries caused by negligence, as in the present case, or other wrong. It is for the merging of such individualized propensities of mind into an amalgam of common judicial experience related to the doing of justice that judges are admonished to resist the

28

> natural temptation to substitute their judgment for that of the jury.
>
> [Id. at 596-97 (footnote omitted).]

A number of practical reasons caution against a trial judge injecting personal experiences of other verdicts into a remittitur analysis -- a caution followed by the judge in the present case. The trial judge's personal experiences, as a litigator or on the bench, are not part of the record. Those experiences are not subject to testing through the adversarial process. The judge cannot be examined to determine whether her recollection is accurate, whether the facts are sufficiently similar to the unique circumstances of the case tried, or whether the cohort of cases in the judge's mind is a statistically significant number from which to draw any definitive judgment. In short, "the process of using these personal experiences defies greatly valued attributes of our judicial system, namely, a party's right to discovery and the right to confront and cross-examine information used to adjudicate the dispute." Mickens v. Misdom, 438 N.J. Super. 531, 540-41 (App. Div.), certif. denied, 221 N.J. 287 (2015).

If the trial judge's personal experiences as a private practitioner and jurist were to be given weight in deciding a remittitur motion, then the same collective experiences of the appellate judges and Supreme Court Justices engaged in a de novo

29

review would likewise be given weight. If that standard applied, then, arithmetically, the experiences of seven members of this Court would always outweigh those of a single trial judge. Such an idiosyncratic approach is the antithesis of the objective approach articulated by Chief Justice Hughes in Baxter, supra, 74 N.J. at 597.

Moreover, trial judges, believing that their personal experiences matter in deciding a remittitur motion, have disclosed their curriculum vitae as evidence of their ability to render a judgment. In He, supra, the trial judge, who had been on the bench less than a year, announced that he had practiced personal injury law for twenty-two years and had been a Certified Civil Trial Attorney. 207 N.J. at 244. In Mickens, supra, the trial judge related that he had practiced as a trial attorney for twenty-nine years; that during twenty of those years he had handled almost exclusively personal-injury cases and tried 100 civil jury trials; that he had been a Certified Civil Trial Attorney, served on several Supreme Court committees, lectured, and written two books on personal-injury law; and, that as a civil trial judge in the last year, he had presided over forty-one trials. 438 N.J. Super. at 542-43. The trial judge in the present case disclosed that she practiced in the field of labor and employment law, even though she did not

30

rely on her personal experience in denying the remittitur motion.

The grant or denial of a remittitur motion cannot depend on the happenstance of the personal experiences of the trial or appellate judges assigned to a particular case. To the extent humanly possible, judges must administer an objective judicial standard. Accordingly, a judge's personal experiences with seemingly similar cases while in practice and on the bench are not relevant in deciding a remittitur motion.

We next address the claim that the trial judge erred in not considering the purportedly comparable verdicts defendants presented in support of the remittitur motion.

D.

We conclude that the comparison of supposedly similar verdicts to assess whether a particular damages award is excessive is ultimately a futile exercise that should be abandoned. Rather, courts should focus their attention on the record of the case at issue in determining whether a damages award is so grossly excessive that it falls outside of the wide range of acceptable outcomes.

Although He, supra, 207 N.J. at 256-57, endorsed the use of comparable verdicts in remittitur motions, we had already opened the door to an analysis of comparable awards in remittitur cases. See Johnson, supra, 192 N.J. at 281 ("Although the court

31

may rely on its knowledge of other injury verdicts, if it does so, it must give a factual analysis of how the award is different or similar to others to which it is compared." (internal citation omitted)); Jastram, supra, 197 N.J. at 234 (same); Fertile, supra, 169 N.J. at 501 (upholding trial court's grant of remittitur, which was based, in part, on court's "experience with other injury verdicts"). What we have come to learn, perhaps too slowly, is that the facts and plaintiffs in every personal-injury or LAD case are fundamentally different and therefore a true comparative analysis is illusory.

Here, the trial judge did not find "comparable" cases and verdicts selected by defendants to have sufficient factual similarities to plaintiffs' case to allow for a true comparison. However, if the court found a true comparable case, the next question would be, which jury conferred the right monetary award? Any true comparative analysis would require a statistically satisfactory class of cases, and the class would have to be composed of not only factually similar cases but also similarly constituted plaintiffs. Then, the court would have to announce the broad range of acceptable emotional-distress awards, given that no two juries would likely return the same award. Stating the issue suggests the futility of that process.

The jury in the case before us sat through days of trial and heard the testimony of many witnesses. The jury presumably

32

made credibility assessments and determined the extent of the emotional injuries suffered by plaintiffs, including how long those injuries afflicted their lives and damaged their relationships. The accounts of jury verdicts reported in the New Jersey Law Journal and other publications, and even unreported decisions of the Appellate Division, are just summaries. Summaries cannot compare to what a jury hears from a witness on the stand; to the timbre of a voice that recalls the emotional cuts and slashes felt from racially animated discrimination; to in-depth descriptions of daily workplace humiliations that mentally beat down an employee; and to first-hand accounts of mental anguish -- anguish that leads to depression and frays personal relationships. The Appellate Division, in Mickens, supra, moreover, expressed concern over the use of jury-verdict summaries in the New Jersey Law Journal and similar publications because they "are based on hearsay or multiple levels of hearsay" and often times are "one-sided." 438 N.J. Super. at 543 n.9.

The unique nature of each case and the suffering of each plaintiff is the reason why juries are told that, in fixing a monetary amount for emotional-distress damages, there is "no better yardstick for your guidance than your own impartial judgment and experience." Model Jury Charges (Civil) § 2.36,

33

"Past and Future Emotional Distress in an Employment Law Case"
(2014).

Juries and judges will often have different opinions about
what constitutes a sufficient monetary award to compensate a
victim for pain and suffering following a tortious injury.
There is no better example than He itself.  In He, supra, the
first jury awarded the plaintiff-wife $1,000,000 in pain-and-
suffering damages and the plaintiff-husband $100,000 in loss-of-
consortium damages.  207 N.J. at 239.  The trial judge granted
the remittitur motion, reducing the wife's award to $200,000 and
her husband's award to $20,000.  Ibid.  The plaintiffs chose a
new trial rather than accede to the remittitur.  Mickens, supra,
438 N.J. Super. at 537 n.3 (citation omitted).  The second jury
awarded the plaintiff-wife $500,000 for her pain and suffering
and her husband $100,000 for loss of consortium.  Ibid.
(citation omitted).  The second trial judge found that the jury
award was not excessive and denied the remittitur, and the
Appellate Division affirmed.  Ibid.

Two different juries in He decided that the husband was
entitled to $100,000 in loss-of-consortium damages. The first
trial judge found that amount excessive, the second trial judge
did not.  The first jury awarded the plaintiff-wife pain-and-
suffering damages in the amount of $1,000,000, the second jury
in the amount of $500,000.  The first trial judge set the

34

remittitur at $200,000, the second trial judge found the $500,000 award not excessive.

The two trials in He suggest that different juries and judges may have different views on the issue of adequate compensation for pain and suffering -- all reasonable and falling within a broad range of acceptable outcomes.

In LAD cases, courts have remitted or vacated emotional-distress awards. See, e.g., Abrams v. Lightolier, Inc., 841 F. Supp. 584, 594 (D.N.J. 1994) (remitting $100,000 award to $2500), aff'd in part and rev'd in part on other grounds, 50 F.3d 1204 (3d Cir. 1995); Grasso v. W. N.Y. Bd. of Educ., 364 N.J. Super. 109, 115 (App. Div. 2003) (upholding trial court's remittitur of emotional-distress award from $110,000 to $11,000), certif. denied, 179 N.J. 312 (2004); Spragg v. Shore Care, 293 N.J. Super. 33, 62-63 (App. Div. 1996) (vacating $42,500 emotional-distress award in LAD gender-discrimination wrongful-termination case).

On the other hand, courts have upheld assertedly high emotional-distress LAD awards, even in the absence of expert testimony from mental-health professionals. See, e.g., Rendine v. Pantzer, 141 N.J. 292, 311-13 (1995) (affirming trial court's denial of remittitur and upholding jury's emotional-damages awards of $105,000 and $125,000 for two plaintiffs in LAD gender-discrimination wrongful-termination case); Quinlan v.

35

Curtiss-Wright Corp., 409 N.J. Super. 193, 217 (App. Div. 2009) (upholding emotional-distress damages of $187,128 in LAD gender-discrimination failure-to-promote case), rev'd on other grounds, 204 N.J. 239 (2010); Lockley v. Turner, 344 N.J. Super. 1, 12-14 (App. Div. 2001) (upholding $750,000 emotional-damages award where "[p]laintiff and his wife were excellent credible witnesses on the effect of sexual harassment on their marriage and family life, and the emotional distress that the marital tensions caused the plaintiff" (alteration in original)), aff'd in part and modified in part on other grounds, 177 N.J. 413 (2003).

The cases cited above may reveal nothing more than that the unique circumstances of each case must guide the outcome. The realization that a wide range of potential awards is permissible counsels for judicial restraint. That is why the remittitur standard is set so high -- a jury award must be so grossly excessive that it shocks the judicial conscience.

A number of states do not allow a collateral attack on a jury's damages award for pain and suffering or emotional distress through the use of purportedly comparable cases. See, e.g., McKissick v. Frye, 876 P.2d 1371, 1388 (Kan. 1994) ("[T]here is no provision in current law for comparison of one plaintiff's recovery with another's to serve as the basis for overturning a jury's verdict."); Seltzer v. Morton, 154 P.3d

36

561, 588 (Mont. 2007) ("[W]e reject the notion that a compensatory award for emotional distress upheld in one case is in any way relevant to the propriety or size of an emotional distress award in another case."); Allied Concrete Co. v. Lester, 736 S.E.2d 699, 708 (Va. 2013) ("Although a trial court may grant remittitur on the grounds that the award is disproportionate to the injuries suffered, we have specifically rejected comparing damage awards as a means of measuring excessiveness." (internal citation omitted)).

At oral argument before this Court, counsel suggested that attorneys are inundating our trial courts with comparable verdicts on remittitur motions. We do not believe that having our trial courts review snippets of information about cases that are not truly comparable is a worthwhile use of judicial resources or likely to bring greater justice to either plaintiffs or defendants. We therefore disapprove of the comparative-case analysis in deciding remittitur motions.

We are confident that the instances in which a remittitur should be granted will be glaring and obvious from the record. For example, in Besler, supra, a school board president violated the civil rights of the plaintiff, a child's parent, by not allowing him to complete a statement critical of the board at a public meeting. 201 N.J. at 555. The plaintiff offered evidence of only "transient embarrassment and humiliation as a

37

consequence of the abrupt manner in which he was prevented from completing his remarks."  Ibid.  We vacated the $100,000 emotional-distress award because it was based on "de minimis mental anguish, or fleeting embarrassment, or mere shock and bewilderment."  Id. at 580.

Ultimately, a damages award cannot stand if it is so grossly disproportionate to the injury suffered that it shocks the judicial conscience.  We cannot envision here the various scenarios that may call for the application of remittitur.  Suffice it to say, remittitur remains a judicial remedy to correct miscarriages of justice caused by grossly excessive damages awards.

To guide judges in carrying out their duties in deciding remittitur motions, we can give no better instruction than the one given to juries in the model jury charge.  See Model Jury Charges (Civil) § 2.36, "Past and Future Emotional Distress in an Employment Law Case" (2014).  Judges know the nature of emotional distress and the function of money and that correlating the two "to arrive at a fair and reasonable award of damages requires a high order of human judgment."  Ibid.  Judges also know that, among different juries, there will be a wide range of acceptable damages awards.  In determining whether a particular award shocks the judicial conscience, judges must

38

rely on that "amalgam of common judicial experience related to the doing of justice." Baxter, supra, 74 N.J. at 597.

In the end, a thorough analysis of the case itself; of the witnesses' testimony; of the nature, extent, and duration of the plaintiff's injuries; and of the impact of those injuries on the plaintiff's life will yield the best record on which to decide a remittitur motion.

IV.

Based on our de novo review of the record, we agree with the Appellate Division that the trial court properly denied defendants' remittitur motion. The jury returned a verdict finding that defendants violated New Jersey's Law Against Discrimination by discriminating against plaintiffs on the basis of race, by subjecting plaintiffs to a hostile-work environment, and by firing them in retaliation for their complaints about their treatment.

In passing the LAD, the Legislature specifically found that victims of discrimination "suffer personal hardships" among which are "physical and emotional stress"; "severe emotional trauma"; "anxiety"; and "career, . . . family and social disruption." N.J.S.A. 10:5-3. The Legislature understood the psychological toll that discrimination may have on victims.[6]

_____

[6] Following the dictates of the LAD, this Court found that a singularly vile and vulgar remark made by a chief executive to

39

Indeed, "the Legislature intended victims of discrimination to obtain redress for mental anguish [and] embarrassment," even when their emotional and physical ailments cannot be characterized as severe.  Tarr, supra, 181 N.J. at 81.  Because of the special harm caused by willful discrimination in the workplace, "compensatory damages for emotional distress, including humiliation and indignity . . . , are remedies that require a far less stringent standard of proof than that required for a tort-based emotional distress cause of action." Id. at 82.  Specifically, in a LAD case, a plaintiff is not required to provide "expert testimony or independent corroborative evidence . . . to support [an] award of emotional distress damages."  Id. at 79 (citing Rendine, supra, 141 N.J. at 312).  Plaintiffs in this case were entitled to "recover all natural consequences of [defendants'] wrongful conduct, including emotional distress and mental anguish damages arising out of embarrassment, humiliation, and other intangible injuries."  Id. at 82; cf. Ostrowski v. Azzara, 111 N.J. 429, 438 (1988) ("[D]efendant must take plaintiff as he finds him." (internal quotation marks omitted) (quoting Frame v. Kothari, 212 N.J. Super. 498, 501 (Law Div. 1985), aff'd in part and

---

an employee injected such hostility into the working environment and so altered the conditions of employment that it gave rise to a cause of action under the LAD.  Taylor v. Metzger, 152 N.J. 490, 506 (1998).

40

rev'd in part, 218 N.J. Super. 537 (App. Div. 1987), aff'd, 115 N.J. 638 (1989)).

Plaintiffs did not offer expert testimony to buttress their emotional-distress damages claims, and because they did not do so, the court correctly did not charge the jury on emotional-distress damages projected into the future. See Battaglia v. United Parcel Serv., Inc., 214 N.J. 518, 554 (2013) (holding that, without expert testimony, emotional-distress damages are limited to past emotional-distress damages through time of trial). The jury was permitted to quantify the emotional-distress damages suffered by plaintiffs up to the time of trial.

Plaintiffs detailed in their testimony a nine-month period of racial harassment and hostility in the workplace carried out by and in the presence of the highest-ranking officers of Wentworth. Plaintiffs were subjected to crude and degrading remarks that invidiously stereotyped them and their heritage -- remarks that cast them in an inferior light and that made plaintiffs feel that they were judged by their appearance and race rather than by their talents and skills. Although both plaintiffs held important positions at Wentworth, they were referred to as Chihuahuas, Latin lovers, and the "Rico Suave brothers." They were the subject of repeated disparaging Hispanic stereotypes from food and music to busboys and stealing hubcaps.

41

Ramon testified that he felt "chopped down day by day, month by month," "helpless," "despondent," and "exhausted." He was beset by anxiety over his financial security and his professional reputation, particularly after the retaliatory firing. Jeffrey described how Wentworth's degrading conduct toward him affected his "psyche" and ruined his "self-confidence," how humiliated he was to be fired several weeks before Christmas for complaining about discriminatory treatment, how anxious he became about whether he could support his family, and how he fell into a depression.

The jury returned an award of $800,000 for Ramon and $600,000 for Jeffrey in emotional-distress damages suffered from April 2007, when the harassment began, until July 2011, the time of trial. The mental anguish and humiliation here were sustained over a long period, and were not fleeting or insubstantial. Although these awards are probably on the high end, like the trial court and the Appellate Division, we cannot say that they are so "wide of the mark," so "pervaded by a sense of wrongness," so "manifestly unjust to sustain," that they shock the judicial conscience. See Johnson, supra, 192 N.J. at 281 (quoting Baxter, supra, 74 N.J. at 598-99).

V.

For the reasons expressed, we affirm the judgment of the Appellate Division, which upheld the trial court's denial of defendants' remittitur motion.


CHIEF JUSTICE RABNER; JUSTICES LaVECCHIA, PATTERSON, FERNANDEZ-VINA, and SOLOMON; and JUDGE CUFF (temporarily assigned) join in JUSTICE ALBIN's opinion.