**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2866-16T2

HELEN R. GODDARD and MALCOLM S.
GODDARD, husband and wife,

     Plaintiffs-Appellants,

v.

JOSEPH I. FINK, JR. and ATLANTIC CITY
ELECTRIC COMPANY, d/b/a ATLANTIC
CITY ELECTRIC, a PHI Company,
a New Jersey Corporation,

     Defendants-Respondents.

_____

Argued September 24, 2018 – Decided October 4, 2018

Before Judges Sabatino and Mitterhoff.

On appeal from Superior Court of New Jersey, Law Division, Atlantic County, Docket No. L-0865-14.

Evan S. Goddard argued the cause for appellants.

Ethan A. Hougah argued the cause for respondents (Montgomery, McCracken, Walker & Rhoads, LLP, attorneys; Gerald J. Corcoran and Ethan A. Hougah, on the brief).

PER CURIAM

After a trial in this personal injury case, a jury found defendant Joseph I. Fink, Jr., fully liable for causing the collision of his employer's truck with plaintiff Helen R. Goddard's car and awarded her $3,000 in damages. One of the key disputed issues at trial was the severity and duration of the bodily injuries plaintiff[1] allegedly sustained as a result of the collision. Plaintiff's medical experts opined that she sustained right shoulder and mild traumatic brain injuries in the accident. Conversely, defendants and their medical expert, orthopedic surgeon Dr. Brian Zell, attributed any lingering complaints to plaintiff's age and pre-existing arthritis and other conditions. Following the verdict, plaintiff moved for additur or, alternatively, a new trial, which the trial court denied.

On appeal, plaintiff argues she was unfairly surprised at Dr. Zell's de bene esse deposition when he was then shown, for the first time, surveillance photographs of plaintiff, and modified his opinions from his earlier expert report about plaintiff's condition and whether she would benefit from surgery. Plaintiff

---

[1] The jury found plaintiff's spouse Malcolm S. Goddard was not entitled to recovery on his per quod claim. For ease of discussion, the references to "plaintiff" in this opinion shall mean Helen R. Goddard, unless otherwise indicated by the context.

A-2866-16T2

argues the defense expert's change of opinion – without first issuing a supplemental expert report – was material and unduly prejudicial. She asserts the trial court erred in allowing the jury to hear those modified opinions.

Plaintiff further argues the trial court erred in its references during the jury charge to concepts of permanency, since defendant drove a commercial vehicle and her claims therefore are not subject to the lawsuit limitation threshold pursuant to N.J.S.A. 39:6A-8(a). Lastly, plaintiff contends the jury's award severely undercompensated her for her injuries and should be either enhanced by additur, or at least set aside pending a new trial on damages.

As elaborated in this opinion, we conclude the defense acted improperly in eliciting opinions from Dr. Zell at his de bene esse deposition concerning the medical significance of the surveillance footage without providing advance notice of those opinions during the discovery period. We reject defendant's argument that the new opinions elicited from Dr. Zell were properly admitted pursuant to N.J.R.E. 703, regardless of any violation of the Court Rules. The defense should have alerted plaintiff to the new opinions before the defense expert's de bene esse deposition. Even so, we discern no reversible error arising from the lack of such advance notice because plaintiff was well equipped to counter Dr. Zell's views with the testimony from plaintiff's two testifying

medical experts opining on the surveillance evidence, and in light of the vigorous cross-examination of Dr. Zell conducted by plaintiff's counsel. In addition, plaintiff has not demonstrated the error was harmful in light of the record as a whole.

We reject plaintiff's claims of error respecting the references to permanency in the jury instructions. The concept of permanency was appropriately included in the instructions in light of plaintiff's allegations and medical proofs that her injuries were unremitting and expected to continue after trial. Moreover, we are satisfied the curative instruction issued by the court, to which plaintiff did not object, sufficiently clarified the durational concepts for the jurors.

Finally, we decline to set aside the jury's assessment of damages, in light of the great deference owed to the jurors' valuation and the principles of Cuevas v. Wentworth Grp., 226 N.J. 480, 501 (2016). No new trial was warranted.

## I.

The motor vehicle accident that is the subject of this appeal occurred on the afternoon of March 8, 2012 in Pomona, at the uncontrolled intersection of White Horse Pike and Genoa Avenue. Plaintiff was driving a yellow Volkswagen Beetle sedan. Fink was driving a white pick-up truck for his

employer, co-defendant Atlantic City Electric Company. Plaintiff had just been with a real estate broker showing the broker a property that plaintiff and her husband wished to place on the market for sale. Fink was returning home from his work shift.

According to plaintiff's version of the accident, she was driving about thirty to thirty-five miles per hour in the right lane of White Horse Pike, heading eastbound. Fink's truck was approaching on White Horse Pike westbound from the opposite direction. Fink made a left hand turn across plaintiff's lane of travel, attempting to turn onto Genoa Avenue. The two vehicles collided, damaging the right front of plaintiff's Volkswagen and the right rear of Fink's truck. The airbag in plaintiff's car did not deploy.

According to Fink, he had proceeded to make his left turn because a large tank truck in the left eastbound lane of White Horse Pike had been turning left at the same time across the intersection. Fink claimed the large truck impeded his ability to see plaintiff's sedan in the next lane.

Plaintiff did not lose consciousness from the collision. She felt chest pain, dizziness, and pains on the right side of her body. She was taken by ambulance to a local hospital, where she was admitted for three days. Plaintiff, who was age seventy at the time of the accident, was concerned about the collision

impairing her heart function because she had aortic valve surgery several years earlier.

After plaintiff was discharged from the hospital, she began treatment with Dr. David M. Anapolle, an orthopedic physician who had been recommended by her primary care physician. Dr. Anapolle initially diagnosed plaintiff with various contusions and a sprain of her cervical spine. He prescribed physical therapy.

After plaintiff's symptoms persisted, particularly in her right shoulder, Dr. Anapolle ordered an MRI study, which revealed arthritis in her right shoulder and a rotator cuff tear. Dr. Anapolle administered cortisone injections, which provided some temporary improvement but did not eliminate plaintiff's symptoms. He determined that arthroscopic surgery on the shoulder would provide plaintiff with her "best chance" of resolving her shoulder problems, but deferred to plaintiff's concern that she did not want to assume the risks of surgery in light of her heart condition.

Dr. Anapolle concluded the motor vehicle accident caused plaintiff's shoulder injury, and that the condition would continue into the future. He particularly noted plaintiff's decreased range of motion in her right shoulder. Plaintiff discontinued treatment with Dr. Anapolle after August 2013.

6

Plaintiff also received treatment from Dr. Jeffrey R. Boxman, a neurologist who she had seen before the accident for unrelated neurological ailments. Following the accident, Dr. Boxman examined plaintiff and conducted neurological testing. He concluded that plaintiff had sustained a concussion in the accident and recommended rehabilitation therapy to improve her balance. Dr. Boxman continued to see plaintiff for several visits until June 2014, and noted the therapy appeared to aid her balance and ability to walk. He opined that the accident had caused neurological injury to plaintiff, that the injury was permanent, and that she is at increased risk of falls and injuries.

Defendants retained as their medical expert Dr. Zell, an orthopedic surgeon, who examined plaintiff on a single occasion in April 2015 after she filed the present lawsuit. During his examination, Dr. Zell noted that plaintiff's range of motion in her left shoulder was normal for a person her age. However, plaintiff's range of motion in her right shoulder appeared to be restricted. In particular, with respect to forward flexion, she showed an inability to raise her right arm more than ninety degrees (i.e., a horizontal position) because she claimed it was too painful to raise it any further, as opposed to a normal range of about 170 degrees for a person her age. When testing the strength in plaintiff's

7

hands, Dr. Zell noted that they dropped as soon as he applied pressure on them, a reaction which he described in his written report as a "volitional giveaway."

Dr. Zell rendered the following expert opinions in the concluding portion of his report:

> It is the opinion of this examining physician to a reasonable degree of medical certainty on the basis of the history obtained, the physical examination performed and the medical records reviewed, that the patient sustained a strain of the right shoulder at the time of the automobile collision in question. On the basis of patient's attestation that she had no symptomatology in the shoulder predating the collision in question and has persistent symptomatology since the collision in question, the automobile collision is considered an exacerbating event of her preexisting arthritis including calcific tendonitis in the right shoulder. The automobile collision in question is not the proximate cause of the osteoarthritis of the AC joint, of the inferior osteophytes off the clavicle of the acromion, or of the partial thickness tear in the shoulder.
>
> This patient has apparently undergone short-lived benefit from the subacromial injection. Her level of comfort and symptomatology may show some benefit from debridement of the calcific deposit and subacromial decompression. It is not anticipated on the basis of the MRI report that the patient had nor does she have a rotator cuff tear necessitating surgical repair.
>
> [(Emphasis added).]

A-2866-16T2

Following Dr. Zell's report, the defense arranged for a company to conduct surveillance of plaintiff and film her taking part in activities in public places. The surveillance was performed on July 3 and 4, 2015. A composite video, approximately a half hour long, was created from the filming, and was ultimately played for the jury at trial. The video shows plaintiff pulling weeds outside of her house, shopping alone in a supermarket pushing a cart and reaching for items on the shelves, and bringing grocery bags into and out of her car. During the course of these filmed activities, plaintiff is shown raising her right arm more than ninety degrees. The video shows plaintiff walking with a slow gait and short steps, but maintaining her balance.

The defense turned over the surveillance video to plaintiff's counsel in discovery. Plaintiff's two medical experts, Dr. Boxman and Dr. Anapolle, each issued a short supplemental report, stating they had reviewed the video and that it did not change their opinions concerning plaintiff's condition. Dr. Boxman stated the video depicts plaintiff as having gait ataxia, noting her short steps. He also noted that when plaintiff bends forward on the video she uses a wide base stance and holds on with one arm to the ground or her thigh for stability. Dr. Anapolle, meanwhile, stated the video did not show plaintiff participating in any activities inconsistent with his previous opinions concerning her

orthopedic limitations. He noted the video shows that, as plaintiff leaned down to pull weeds, she used her left arm to support her weight and did not place significant force on her right arm. Dr. Anapolle also noted that plaintiff's actions in carrying small shopping bags placed only a small amount of stress on her right shoulder.

The defense did not ask Dr. Zell to provide a supplemental expert report after the surveillance. Instead, the defense waited about six months, by which point discovery had concluded, to show the video (or photos of plaintiff extracted from it) to Dr. Zell for the first time at his de bene esse deposition in February 2016. When Dr. Zell was asked about the video on direct examination by defense counsel, plaintiff's counsel objected, claiming unfair surprise. The objection was preserved for the trial court's consideration. Defense counsel then proceeded to ask Dr. Zell about the significance of the surveillance to his own opinions. Among other things, Dr. Zell provided these responses:

> Q. Doctor, would you engage the computer so we can see that surveillance?
>
> A. Sure.
>
> Q. And then I'm going to get to a point where I'm going to ask you to stop. Stop it right there.
>
> A. My timing isn't as good as yours so I'll back this up just a little bit I think is what you wanted me to

do. Shoot. I can't get it. Now, I think that's the one you want.

Q.   Now, in the picture [photo or video] let's assume that's Mrs. Goddard.

A.   Okay.

Q.   Does that demonstrate forward flexion?

A.   Yes, it does.

Q.   And can you estimate what degree of forward flexion that is?

A.   160 to 165 degrees.

Q.   And, in your opinion, what is normal forward flexion for a 72-year-old?

A.   165 to 170 degrees.

Q.   So in that picture it appears that she has full range of motion.

A.   She has full forward flexion.

Q.   And, again -- why don't we close that. And, again, just remind the jury of the amount of forward flexion that she demonstrated to you during her examination.

A.   She permitted and she stopped herself at 90 degrees, right here (indicating). I'll turn sideways. Right here (indicating).

. . . .

Q.    If her forward flexion had been 160 degrees instead of 90 degrees, would it have changed your opinion --

[PLAINTIFF'S COUNSEL]:    Objection. Leading.

Q.    -- would it have changed your opinion relative to the need for surgery?

A.    Yes, actually.

Q.    How would it have changed it?

A.    I would have been less inclined to suggest that she needs surgery.

Q.    Why?

A.    Because the -- my thought process is the rationale for her as a potential surgical candidate was based on her limitation of motion which she proffered was a result of pain in the forward flex position. The consideration for surgery was also knowing that she has a calcium deposit on her rotator cuff and that she has spurs that hang down from the undersurface of the acromion and the clavicle and that those spurs do have an impinging effect or a rubbing effect on her rotator cuff. So if her motion was far better, I would have been less inclined to suggest that she need surgery.

[DEFENSE COUNSEL]:    Thank you. That's all I have.

[(Emphasis added).]

12

Before the trial began, plaintiff moved in limine to exclude the portions of Dr. Zell's videotaped deposition that referred to the surveillance video and his related opinions. Plaintiff also moved to exclude other portions of the deposition that are not raised as an issue on this appeal. The trial court denied the motion in limine, recognizing the surveillance video had been turned over to plaintiff in discovery and concluding that the defense expert was permitted to comment about the significance of that evidence.

The trial proceeded, with plaintiff and defendant each presenting several witnesses on liability and damages. The expert testimony of Dr. Boxman and Dr. Anapolle for plaintiff and Dr. Zell for the defense was presented to the jury on video through their recorded de bene esse depositions. The trial testimony of those experts was substantially consistent with their respective reports, apart from Dr. Zell's additional findings regarding the significance of the surveillance evidence. During her trial testimony, plaintiff attempted to explain that the surveillance video was not a fair indication of her condition because it was filmed on days without precipitation when her symptoms tend to be less pronounced. She also noted the hatchback door on her car is light and does not require much strength to pull down.

The jury returned a verdict finding that defendant Fink was one hundred percent at fault in causing the accident. The jury also found that plaintiff had proven she was injured as a proximate cause of the accident. The jury awarded plaintiff $3,000 in damages for her claimed pain and suffering, awarding no damages on her spouse's per quod claims. No economic damages were claimed or awarded.

Following the verdict, plaintiff moved for a new trial or, in the alternative, additur of the damages award. The trial court denied that motion in an oral opinion, and this appeal ensued.

On appeal, plaintiff contends that the trial court erred in: (1) admitting Dr. Zell's opinions concerning the surveillance video; (2) referring several times to the term "permanency" in the jury instructions; and (3) denying the motion for a new trial on damages or additur. Defendants have not cross-appealed, thereby leaving the adverse liability verdict intact.

II.

The primary issue on appeal concerns Dr. Zell's videotaped testimony commenting on the surveillance evidence. This issue implicates both the Rules of Court and the Rules of Evidence. In considering plaintiff's claim of error, we recognize the substantial deference we generally afford to trial judges in

A-2866-16T2

applying the civil pretrial and discovery rules, see, e.g., Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 371 (2001) (generally applying an abuse of discretion standard relating to matters of discovery), and admissibility rulings concerning trial evidence, see, e.g., In re Accutane Litig., ___ N.J. ___, ___ (2018) (slip op. at 71) (reaffirming the abuse of discretion standard for reviewing evidentiary rulings on expert testimony).  If an abuse of discretion is shown, the appellant must also generally demonstrate the error was harmful and "clearly capable of producing an unjust result."  R. 2:10-2; see also Pellicer ex rel. Pellicer v. St. Barnabas Hosp., 200 N.J. 22, 55 (2009) (recognizing that "even a large number of errors, if inconsequential, may not operate to create an injustice" and require a civil judgment to be set aside).

The Rules of Court dictate the appropriate procedures for the pretrial disclosure of expert opinions.  Rule 4:10-2(d)(1) authorizes a party to obtain discovery of the credentials and opinions of an opposing party's expert through service of an interrogatory requesting that information.  There is no dispute that plaintiff made such a routine request in this case.  Rule 4:17-4(e) specifies that the answering party must supply "an exact copy of the entire report or reports rendered by the expert or physician."  Among other things, Rule 4:17-4(e) requires the report to "contain a complete statement of that person's opinions

15

and the basis therefor," as well as "the facts or data considered in forming the opinions." (Emphasis added). Except as may be otherwise provided by Rule 4:17-4(e), if a party who has supplied interrogatory responses "thereafter obtains information that renders such answers incomplete or inaccurate, amended answers shall be served not later than 20 days prior to the end of the discovery period[.]" R. 4:17-7. "Amendments may be allowed thereafter only if the party seeking to amend certifies therein that the information requiring the amendment was not reasonably available or discoverable by the excuse of due diligence prior to the discovery end date." Ibid. This continuing obligation to disclose or update material changes in discovery responses is well established and not refuted by defendants. See, e.g., McKenney v. Jersey City Med. Ctr., 167 N.J. 359, 370-72 (2001); Amaru v. Stratton, 209 N.J. Super. 1, 11 (App. Div. 1985).

It is also well established that, as a general matter, "[a]n expert's testimony at trial may be confined to matters of opinion contained within the expert's report." Mauro v. Owens-Corning Fiberglass Corp., 225 N.J. Super. 196, 206 (App. Div. 1988), aff'd, 116 N.J. 126 (1989). The court is empowered to impose sanctions for such non-disclosure, including the exclusion of the expert's undisclosed opinions at trial. Id. at 206-07 (upholding the exclusion of facts, data, and related opinions plaintiff's expert had not revealed until the time of

trial). In calibrating the appropriate sanctions for a proven violation, courts are to consider such factors as whether there is: "(1) the absence of a design to mislead, (2) [the] absence of the element of surprise if the evidence is admitted, and (3) [the] absence of prejudice which would result from the admission of the evidence." Westphal v. Guarino, 163 N.J. Super. 139, 146 (App. Div.), aff'd o.b., 78 N.J. 308 (1978); see also Amaru, 209 N.J. Super. at 11 (reiterating these factors). With respect to the "hallmark" element of surprise, "[a] party cannot claim surprise . . . when the testimony of the expert contains 'the logical predicates for and conclusions from statements made in the report[.]'" Velazquez ex rel. Velazquez v. Portadin, 321 N.J. Super. 558, 576 (App. Div. 1999) (quoting McCalla v. Harnischfeger Corp., 215 N.J. Super. 160, 171 (App. Div. 1987)), rev'd on other grounds, 163 N.J. 677 (2000).

Defendants argue they had a right to present Dr. Zell's opinions at trial concerning the surveillance evidence pursuant to N.J.R.E. 703, which provides that "[t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing." (Emphasis added). Defendants contend the surveillance video was such evidence "made known to" Dr. Zell "at" his de bene esse deposition, and thus admissible. Moreover, they persuaded the trial court that

A-2866-16T2

the surveillance-related opinions elicited from Dr. Zell were akin to testimony in response to hypothetical questions. We reject these legal contentions.

As this court held long ago in Mauro, 225 N.J. Super. at 207, the predecessor to N.J.R.E. 703, former Evidence Rule 57, which allowed an expert to refer at trial to certain facts or data not previously disclosed, did not authorize a party to use that evidence provision to circumvent an expert's pretrial disclosure obligations under the Rules of Court. To read the rules of evidence in that fashion is improper, because it "essentially nullifies the purpose of R. 4:10-2(d)(1), which requires disclosure . . . of the 'substance of the facts and opinions' to which the expert is expected to testify, as well as the expert's written report." Ibid.

The evidence rule cannot nullify the Rules of Court in this fashion. Logically construed, N.J.R.E. 703 appears to be designed to allow the parties' experts to react to unanticipated evidence that emerges for the first time at trial, and to adjust their expert opinions accordingly, such as when a fact witness at trial revises his or her estimate of a vehicle's speed or the distances involved. That is not the situation here.

Moreover, we disagree with the defense's effort to characterize Dr. Zell's opinions concerning the significance of the surveillance evidence as mere

responses to hypothetical questions. The surveillance evidence was real and not hypothetical in nature. The defense expert's assessment of that new evidence should have been disclosed long before his de bene esse deposition was taken, just as plaintiff responsibly had each of his two medical experts issue supplemental reports commenting on the surveillance proof before their own trial testimony was videotaped. The trial court misapplied its discretion in condoning defendants' manner of handling the situation. At oral argument on the appeal, defense counsel asserted that his office waited to provide the surveillance evidence to Dr. Zell until the day of his videotaped testimony for strategic reasons. Although the lack of earlier notice to plaintiff may well have given the defense a degree of strategic advantage, that advantage was unearned and unjustified.

That said, we must also consider the extent to which the defense's belated revelation of Dr. Zell's revised findings was likely to cause any actual prejudice to plaintiff. This involves a focus on the extent to which Dr. Zell's updated views materially diverged from his original report, and whether those views could not have been reasonably foreseen by astute plaintiff's counsel. A fair reading of the record reflects that Dr. Zell's testimony about the surveillance evidence differed from his earlier report in two material respects. First, the

19

doctor found that plaintiff's arm movements on the video showed right forward flexion of as much as 165 degrees, in contrast to the ninety-degree limited range she exhibited during his office examination. That is a material difference. Second, as the deposition passages quoted above reflect, Dr. Zell explicitly changed his opinion about whether plaintiff could benefit from right shoulder surgery, noting that her unrestricted arm movements on the video made him "less inclined to suggest that she need[s] surgery." This change of opinion is also material, albeit to a lesser extent than the range-of-motion flexion percentages.

Even so, we are unpersuaded that these discrete changes in Dr. Zell's assessment of plaintiff comprised a sufficiently prejudicial and unfair surprise to warrant a new trial. As the trial court correctly recognized, the underlying facts and data from the surveillance were duly turned over to plaintiff's counsel during the discovery period, which ended in October 2015. Plaintiff does not argue that the surveillance proof itself was improperly procured. Once plaintiff's counsel reviewed the video proof, it could reasonably be expected that proof would only fortify Dr. Zell's "bottom-line" conclusion that plaintiff suffered only limited orthopedic problems from the accident and that her complaints were objectively more attributable to other factors such as her age and degeneration. As he phrased it, the new evidence made Dr. Zell "less inclined" to discern a

20

need for surgery. That modification of his original opinion was reasonably predictable, particularly given plaintiff's theme that the expert was generally biased in favor of the defense's interests.

Plaintiff has not demonstrated that she was without effective means to counter Dr. Zell's surveillance-related commentary. For one thing, plaintiff had already procured supplemental opinions from her two medical experts explaining why the surveillance evidence did not affect their own assessments. Plaintiff's own trial testimony provided an explanation of why on the particular days she was filmed she was feeling better than she would have felt in inclement weather. Plaintiff's attorney also skillfully cross-examined Dr. Zell at length in an effort to undercut the credibility and weight of the doctor's assertions. Moreover, plaintiff did not make any application to the trial court to extend the discovery period in light of Dr. Zell's revised opinions, or to have her own experts' reports further supplemented. We also note plaintiff's two experts were not video recorded until after Dr. Zell's deposition, thereby affording them the opportunity to take his testimony into account beforehand. That diminishes the asserted harmfulness of Dr. Zell's brief discussion of that evidence.

Further, the trial judge reasonably found in his denial of plaintiff's post-trial motion, that the surveillance evidence itself – a form of factual proof – was

21

particularly devastating to plaintiff's case. With their own eyes, the jurors could evaluate plaintiff's movements while weeding, shopping, and lifting groceries, and assess directly whether those activities were consistent with plaintiff's claims of injury.

In sum, despite our disapproval of the defense's discourteous and inappropriate non-disclosure, we conclude that plaintiff has not demonstrated error that was sufficiently harmful to mandate a new trial on that basis. Nicosia v. Wakefern Food Corp., 136 N.J. 401, 412 (1994) (declining to order a new trial in a civil case where the claimed errors were not also shown to be sufficiently harmful). Even so, we urge counsel in future cases to eschew the course of action followed here. Specifically, counsel should not deliberately hold back from providing their medical experts with surveillance evidence in their possession until the day of the expert's post-discovery de bene esse videotaping session.

## III.

Plaintiff next contends she was severely prejudiced by the fact that the trial court mentioned the term "permanency" several times during the jury instructions. We discern no reversible error from these inadvertent references. For one thing, plaintiff was clearly seeking in this case damages for both past

22

and future pain and suffering. Although permanency was not required to be proven in order for plaintiff to recover an award for past damages, the concept logically was an ingredient of the case. Indeed, both of plaintiff's medical experts testified they expected plaintiff's post-accident injuries to continue into the future.

We also note that the trial court issued a curative instruction to the jurors, accurately clarifying that plaintiff had no obligation to prove permanency and that she was entitled to recover for both proximately-caused past and future injury. Plaintiff did not object to that curative instruction after it was issued. The law presumes that jurors are capable of following curative instructions. Williams v. James, 113 N.J. 619, 632 (1989); see also State v. Burns, 192 N.J. 312, 335 (2007) (recognizing this presumption as to jury instructions in general). The clarifying instruction issued by the court here was presumptively obeyed. The fact that the jurors awarded some damages, albeit a small amount, provides some indication that they did not misunderstand the law. If they erroneously thought plaintiff had to prove permanent injury to recover anything in this case, and failed to meet such a burden, they would have awarded no damages at all.

A-2866-16T2

## IV.

Finally, we address plaintiff's argument that she was entitled to a new trial or, alternatively, additur of the monetary award. Recently, in Cuevas, 226 N.J. at 501, the Supreme Court underscored the deference owed to juries as the triers of fact in calibrating non-economic damages. "[A] permissible award may fall within a wide spectrum of acceptable outcomes." Id. at 500. In Cuevas, 226 N.J. at 503, the Court retracted its previous approach in He v. Miller, 207 N.J. 230, 251-56 (2011), which called for a more exacting post-trial review of jury awards with the use of comparative verdict data. The principles justifying such deference equally apply to a plaintiff's post-trial motion for additur as they do to a defendant's post-trial motion for remittitur.

A motion for a new trial based upon a claim the verdict is against the weight of the evidence generally rests upon the sound discretion of the trial judge. Baumann v. Marinaro, 95 N.J. 380, 389 (1984). We are not convinced the trial court misapplied its discretion here in leaving the jury's verdict intact. Among other things, plaintiff's cessation of treatment, her age, her previous medical problems, her lack of wage loss or other economic damages, and her activities depicted on the surveillance film all provide a rational explanation for the modest damages figure the jurors agreed upon.

Ultimately, the jurors apparently found plaintiff and her experts to be less credible about her injuries than had been anticipated from her perspective. Guided by Cuevas, we have no reason to second-guess the jurors' decision. The award, while no doubt disappointing to plaintiff, does not "shock the judicial conscience." Cuevas, 226 N.J. at 503.

The balance of plaintiff's contentions, including her argument that the trial judge did not pay sufficient attention to any reactions of the jurors as they heard the videotaped testimony, lack sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E). The judge's prompt and thoughtful rulings on various objections posed during the trial, and his references to the substance of the evidence, evinces a strong familiarity with the proofs and his overall attentiveness to the case as it unfolded.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

25

A-2866-16T2