**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2935-18T1

ROBERT COHEN,

     Plaintiff-Appellant,

v.

THOMAS BALDWIN, and
R-D TRUCKING, INC.,

     Defendants-Respondents.

_____

Argued December 16, 2019 – Decided February 26, 2020

Before Judges Rothstadt, Moynihan and Mitterhoff.

On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Docket No. L-4150-16.

Edward P. Capozzi argued the cause for appellant (Brach Eichler, LLC, attorneys; Edward P. Capozzi and Kristofer Charles Petrie, on the briefs).

Virginia E. Hughes argued the cause for respondents (Zirulnik, Sherlock & DeMille, attorneys; Virginia E. Hughes, on the brief).

PER CURIAM

Plaintiff Robert Cohen appeals from the trial court's February 4, 2019 order denying his motion for a new trial as to damages, or alternatively for additur. Plaintiff sustained severe injuries in a car collision with defendant Thomas Baldwin. After a trial, the jury returned a verdict finding plaintiff to be fifty percent at fault and awarded him damages of $100,000 for pain and suffering, $250,000 for future medical expenses, and $15,500 for lost wages, for a total gross verdict of $365,500. After reducing the verdict to reflect the comparative negligence finding, the resultant award for compensatory damages was $182,750. Plaintiff unsuccessfully moved for a new trial or, alternatively, additur specifically as to damages awarded for pain and suffering. Having reviewed the record, and considering the applicable law, we affirm.

I.

We discern the following facts from the record. On May 6, 2016, plaintiff was involved in a car collision with defendant, who "was operating a commercial vehicle, owned by defendant, R-D Trucking, Inc." Plaintiff suffered numerous injuries, including fractures to his right femoral head, right hip joint, right acetabulum, left tibia, left fibula, sternum and ribs; a dislocated right hip; and a right-sided pneumothorax. Immediately following the accident, plaintiff underwent several invasive medical procedures to address his injuries, which

left him with permanent scarring. On May 17, 2016, plaintiff was admitted to Kessler Rehabilitation Hospital/Chester Facility, where he participated in "physical and occupational therapy, to improve his mobility, maintain medical stability, improve his activities of daily living and provide a safe discharge home."

On December 5, 2016, plaintiff filed a complaint alleging negligence against defendants.[1] On November 26, 2018, the matter was tried before Judge Bruno Mongiardo and a jury. At trial, plaintiff introduced testimony from two medical experts. The first expert witness was Dr. Patricio Grob, plaintiff's treating orthopedic surgeon. Dr. Grob testified as to various procedures that he performed on plaintiff immediately after the accident. Dr. Grob next saw plaintiff on May 31, 2016 and observed that despite some bruising, plaintiff's bones were healing. After taking x-rays, Dr. Grob found that "his fractures were well-aligned" and that his leg showed early signs of healing. Dr. Grob observed

---

[1] The matter was consolidated with a property damage claim brought against plaintiff by Selective Casualty Insurance Company (Selective), R-D Trucking, Inc.'s insurer. On July 25, 2018, Selective dismissed without prejudice its claims against plaintiff, which were to be resolved in binding arbitration. On July 26, 2018, an arbitrator entered a report and award of arbitrator, finding both plaintiff and Baldwin to be equally at fault and awarding plaintiff gross damages of $1,600,000, and net damages of $800,000, resolving the dispute as between Selective and plaintiff.

A-2935-18T1

additional improvement at a follow-up appointment on June 27, 2016, after which he gave plaintiff permission to walk. As of the date of that appointment, plaintiff had stopped taking pain medication.

After a subsequent follow-up on July 25, 2016, Dr. Grob noted that plaintiff was more comfortable and "moving more fluid," while plaintiff's x-rays showed that his injuries were at "a mature point of healing." At this point, plaintiff was now able to move "without any assistant devices . . . [such as] crutches or a cane," and he had "symmetrical" strength in his legs. Dr. Grob observed on this date, however, that plaintiff had a "Trendelenburg-type gait," meaning "a little gimp or a little hitch . . . in [his] walk on the right side." Dr. Grob next saw plaintiff on August 22, 2016 and found further improvement, as plaintiff was walking without any pain, and his injuries were healing normally.

Despite Dr. Grob recommending to plaintiff that he be reassessed every four weeks, plaintiff did not schedule another appointment until May 30, 2017, which was also the last date on which Dr. Grob examined him. Dr. Grob was unaware of the reason for the delay but ventured that the common reason is because "[p]eople get back to their life. Their complaints aren't as bad, and they move on . . . . [Plaintiff's] a young . . . 22-year-old guy. . . . [Y]oung guys tend to get lost." During the May 2017 visit, Dr. Grob found that plaintiff was doing

well but also noted that plaintiff had "some residual complaints," including right hip and left knee pain. X-rays taken at the visit revealed that all fractures had healed. Additionally, plaintiff was walking without a limp, "was able to fully squat and return to an upright posture," and had no tenderness or effusion in his left knee. Dr. Grob determined, however, that plaintiff was starting to develop signs of trauma-related arthritis and that he had a "heterotopic ossification, calcification, over the lateral acetabulum."[2] Dr. Grob did not recommend any additional follow-up treatment after the May 2017 visit.

Dr. Grob summarized that "from [his] perspective, [plaintiff] had some minor complaints . . . but his level of function was very good." However, he opined that "[t]he odds are against . . . [plaintiff's] hip . . . lasting," and plaintiff "will likely have some sort of hip pains," although Dr. Grob could not speculate as to whether he would require a hip replacement in the future.

Plaintiff's second medical expert was Dr. Craig H. Lichtblau, who had conducted a comprehensive medical examination of plaintiff. Dr. Lichtblau opined that plaintiff "may perform bending, twisting, kneeling, climbing protected heights if tolerable[,] . . . repetitive reaching overhead, repetitive

---

[2] As Dr. Grob explained, a "heterotopic ossification, calcification," in layman's terms, is a "bone growth over the hip and in the muscle."

 A-2935-18T1

movements of elbows (handling), pushing and pulling." Dr. Lichtblau cautioned, however, that plaintiff "should avoid repetitive bending, squatting, crawling, climbing unprotected heights[,] . . . running and jumping." Dr. Lichtblau found that plaintiff had a medium "estimated residual physical functioning strength level from the floor - to - shoulders position," meaning he was capable of "[e]xerting [twenty] to [fifty] pounds of force occasionally or [ten] to [twenty-five] pounds of force frequently or greater than negligible up to [ten] pounds of force constantly to move objects."

Dr. Lichtblau found that plaintiff "is going to suffer from acute, intermittent exacerbations of chronic pain and discomfort and, when he experiences these . . . exacerbations . . . he will have good days, bad days and missed days of work." Dr. Lichtblau advised that to deal with these exacerbations, plaintiff would "require short courses of [physical therapy], injections, and oral medications." He also "may require future surgical intervention." Dr. Lichtblau determined that plaintiff "has a [fourteen percent] permanent partial impairment of the whole person," and as plaintiff ages, "his disability will actually increase over time." Dr. Lichtblau found plaintiff to have a "life expectancy of 54.7 years," and he estimated that based on this figure, as

well as his review of medical reports and plaintiff's physical evaluations, the cost of plaintiff's future medical care would be $504,000.

Prior to closing arguments, defendants offered plaintiff $750,000 to settle the lawsuit, but plaintiff rejected the offer. The jury returned a verdict finding plaintiff fifty percent at fault and awarding him damages of $100,000 for pain and suffering, $250,000 for future medical expenses, and $15,500 for past lost wages, for a total verdict of $365,500. This amount was reduced to reflect the comparative negligence finding, resulting in an award of $182,750.

Thereafter, plaintiff moved for a new trial as to the damages awarded for pain and suffering, or in the alternative, for additur. The judge held a hearing on plaintiff's motion and commented that he was "surprised" at the amount the jury awarded plaintiff for pain and suffering. Relying on Cuevas v. Wentworth Group, 226 N.J. 480, 485 (2016), however, the judge determined that to warrant a new trial, damages must have "shock[ed] the judicial conscience," not his "individual feelings" as the judge overseeing the case. The judge stated that to overturn the jury's determination, he would essentially need to "find that their deliberations were a sham."

The trial judge explained that the verdict could have been influenced in part by plaintiff's own experts. Specifically, the judge commented that while

testifying, Dr. Lichtblau came across as "pompous and arrogant." Moreover, the judge highlighted that "there was . . . a subtle inconsistency between what [Dr. Lichtblau] was saying and what [Dr. Grob] was saying," as Dr. Grob "didn't seem to be terribly concerned with [plaintiff's] residuals." The jury likely weighed this discrepancy when deliberating. The judge also explained that his "impression of [plaintiff] . . . on the stand . . . was he's doing quite well with his life right now." He did not "come across like a person who was still dealing with the residuals of this particular accident."

The judge explained that attorneys "have a totally different perspective" on damages compared with the average juror, and the jury charge on damages affords jurors significant discretion in fixing verdicts. The judge reaffirmed that the court should only amend the award "[i]f the jury was totally outrageous in the way [it] handled the case," and based on "the totality of the verdict," this jury considered "all of the facets of this case." Therefore, the award did not shock the judicial conscience. On February 4, the judge entered an order denying plaintiff's motion.

On February 22, 2019, the trial judge entered an order of judgment allocating 50% of the fault to plaintiff, 18.5 % to Baldwin, and 31.5% to R-D Trucking, Inc. The judgment awarded plaintiff damages commensurate with the

verdict, and after factoring in an ERISA lien of $20,150.44 for past medical expenses[3] and interest under Rule 4:42-11(b), the judge entered a judgment of $206,789.75 in plaintiff's favor. This appeal ensued.

On appeal, plaintiff raises the following arguments:

> I. THIS COURT SHOULD GRANT . . . PLAINTIFF A NEW TRIAL AS TO DAMAGES ONLY BECAUSE THE JURY'S AWARD OF $100,000 FOR PAIN AND SUFFERING SHOCKS THE JUDICIAL CONSCIENCE.
>
> II. THIS COURT SHOULD OVERTURN THE HOLDING IN BOTTA V. BRUNNER, 26 N.J. 82 (1958), THAT PROHIBITS [A] PLAINTIFF FROM ASKING THE JURY TO AWARD A SPECIFIC DOLLAR AMOUNT AS TO DAMAGES (NOT RAISED BELOW).

We address plaintiff's arguments in turn.

## II.

"The standard governing [our] review of a trial court's action on a new trial motion is essentially the same as that controlling the trial judge." Dolson v. Anastasia, 55 N.J. 2, 7 (1969) (citing Hager v. Weber, 7 N.J. 201, 212 (1951)). The trial judge may grant a new trial where the jury's verdict is against the weight of the evidence:

---

[3] The parties stipulated to this figure.

A new trial may be granted to all or any of the parties and as to all or part of the issues on motion made to the trial judge. . . . The trial judge shall grant the motion if, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a miscarriage of justice under the law.

[R. 4:49-1(a).]

Analyzing whether the verdict is against the weight of the evidence

calls for a high degree of conscientious effort and diligent scrutiny. The object is to correct clear error or mistake by the jury. Of course, the judge may not substitute his judgment for that of the jury merely because he would have reached the opposite conclusion; he is not a thirteenth and decisive juror.

[Dolson, 55 N.J. at 6.]

"A miscarriage of justice has been described as a pervading sense of wrongness needed to justify [an] appellate or trial judge undoing of a jury verdict . . . [which] can arise . . . from manifest lack of inherently credible evidence to support the finding, obvious overlooking or under-valuation of crucial evidence, [or] a clearly unjust result[.]" Risko v. Thompson Muller Auto. Grp., Inc., 206 N.J. 506, 521 (2011) (alterations in original) (internal quotation marks omitted) (quoting Lindenmuth v. Holden, 296 N.J. Super. 42, 48 (App. Div. 1996)); see Lanzet v. Greenberg, 126 N.J. 168, 175 (1991) (explaining that the court may

retry issues of fact where a jury verdict is "clearly the product of mistake, passion, prejudice, or partiality").

"[T]he trial judge must . . . canvass the record, not to balance the persuasiveness of the evidence on one side as against the other, but to determine whether reasonable minds might accept the evidence as adequate to support the jury verdict[.]" Dolson, 55 N.J. at 6 (quoting Kulbacki v. Sobchinsky, 38 N.J. 435, 445 (1962)).  A motion for a new trial considers "not only tangible factors relative to the proofs as shown by the record, but also appropriate matters of credibility, generally peculiarly within the jury's domain, so-called 'demeanor evidence,' and the intangible 'feel of the case' which he has gained by presiding over the trial." Ibid.  In making this determination, we must accept as true the evidence supporting the jury's verdict and all permissible inferences drawn therefrom to determine whether to uphold the verdict.  Boryszewski v. Burke, 380 N.J. Super. 361, 391 (App. Div. 2005).  However, we otherwise make our own independent determination of whether a miscarriage of justice occurred. See Baxter v. Fairmont Food Co., 74 N.J. 588, 597-98 (1977).

III.

Plaintiff first argues that the jury's award for pain and suffering was against the weight of the evidence.  Plaintiff explains that the expert testimony

A-2935-18T1

established that his injuries were "horrific," and the award was so low that it constituted a miscarriage of justice and shocked the judicial conscience. In support of this argument, plaintiff points to the valuation of the case by the arbitrator and defendants, which led to their settlement offer of $750,000 before the verdict. We disagree.

"[T]here is a presumption of correctness in jury verdicts." Romano v. Galaxy Toyota, 399 N.J. Super. 470, 477 (App. Div. 2008) (citing Baxter, 74 N.J. at 598). "[T]he trial court may not disturb a damages award entered by a jury unless it is so grossly excessive or so grossly inadequate 'that it shocks the judicial conscience.'" Orientale v. Jennings, 239 N.J. 569, 595 (2019) (quoting Cuevas, 226 N.J. at 485). "A judge . . . should not rely on personal knowledge of other verdicts. The standard is not whether a damages award shocks the judge's personal conscience, but whether it shocks the judicial conscience." Cuevas, 226 N.J. at 486.

"[T]here must be some 'wrongness' to justify a trial or appellate court overturning a jury verdict. . . . 'This sense of "wrongness" can arise . . . from manifest lack of inherently credible evidence to support the finding, obvious overlooking or undervaluation of crucial evidence, a clearly unjust result, and

many others [ways].'" Von Borstel v. Campan, 255 N.J. Super. 24, 29 (App. Div. 1992) (quoting State v. Johnson, 42 N.J. 146, 162 (1964)).

As our Supreme Court noted in Johnson v. Scaccetti, 192 N.J. 256, 279–80 (2007), "[d]etermining just compensation for an accident victim, particularly when the damages are not susceptible to scientific precision, as in the case of pain and suffering damages, necessarily requires a high degree of discretion. That is so because there is no neat formula for translating pain and suffering into monetary compensation."

While plaintiff is understandably disappointed in the jury's award for pain and suffering, as the trial judge found, the gross verdict of $365,500 was not so inadequate as to shock the judicial conscience. See Orientale, 239 N.J. at 595 (quoting Cuevas, 226 N.J. at 485); Romano, 399 N.J. Super. at 477. The trial judge rightly observed that jurors do not evaluate the quantum of damages as attorneys or even judges do. Plaintiff incorrectly construed the trial judge's comment that he was "shocked" by the award for pain and suffering to mean that the award "shock[ed] the judicial conscience." See Cuevas, 226 N.J. at 485. The standard requires more than that an individual judge be shocked and requires that the award be shocking to the institution of our judicial system, such

that the verdict was inherently wrong.  See Dolson, 55 N.J. at 6; Campan, 255 N.J. Super. at 29.

In that regard, as the trial judge noted, plaintiff's own experts did not provide compelling testimony as to plaintiff's pain and suffering as of the date of trial or in the future.  Plaintiff's treating surgeon, Dr. Grob, testified that as of his last examination in May 2017, plaintiff had minimal complaints, did not require pain medication, had no residual limp, and never returned for follow up care.  Although Dr. Lichtbau painted a somewhat more dismal view of plaintiff's prognosis, he also confirmed that as of the time of trial, plaintiff was functioning well.  To the extent the experts' opinions conflicted, the judge found that Dr. Lichtblau appeared to be "pompous and arrogant" while testifying.  The judge also found that plaintiff appeared to be "doing quite well" and did not appear to be "dealing with the residuals of [his] accident."  Notwithstanding the objective reasonableness of the jury's assessment of plaintiff's damages for pain and suffering, the jury awarded him a substantial amount, $250,000, for future medical costs, an award that was supported by the medical testimony.

In short, canvassing the record before us, the jury's award of pain and suffering was not a miscarriage of justice, as it was supported by the evidence

14

at trial, and it was not so paltry as to shock the judicial conscience. R. 4:49-1(a); Baxter, 74 N.J. at 597-98; Dolson, 55 N.J. at 6-7.

Plaintiff next argues, for the first time, that this court should revisit the Supreme Court's holding in Botta v. Brunner, 26 N.J. at 103, which bars litigants from requesting that jurors award specific dollar amounts for monetary damages. We "decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available 'unless the questions so raised on appeal go to the jurisdiction of the trial court or concern matters of great public interest.'" Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973) (quoting Reynolds Offset Co., Inc. v. Summer, 58 N.J. Super. 542, 548 (App. Div. 1959)). We see no basis to depart from that sound policy in this case.

Regardless, we decline plaintiff's invitation to overturn longstanding precedent. "We are bound by the principles of law developed and declared by our Supreme Court. Extensive policy shifts of this magnitude should not be initiated by an intermediate appellate court. The appropriate tribunal to accomplish such drastic changes is either the Supreme Court or the Legislature." Namm v. Charles E. Frosst & Co., 178 N.J. Super. 19, 35 (App. Div. 1981).

To the extent that we have not addressed the parties' remaining arguments, we conclude that they lack sufficient merit to warrant discussion in a written opinion.  <u>R.</u> 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2935-18T1