**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2245-18T2

S.T. AND N.T., each
individually and on
behalf of S.T.,[1]

      Plaintiffs-Appellants,

v.

JERSEY CITY BOARD OF
EDUCATION,

      Defendant-Respondent.

_____

Argued February 5, 2020 – Decided December 2, 2020

Before Judges Fuentes, Haas and Enright.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Docket No. L-4178-16.

David R. Giles argued the cause for appellants (Law Offices of David R. Giles, attorneys; David R. Giles, on the briefs).

---

[1] Pursuant to Rule 1:38-3(d) (17), we use initials to identify plaintiffs. Furthermore, because their son's name has the same initials as his father, we will use a pseudonym to identify the child.

Cherie L. Adams argued the cause for respondent (Adams Gutierrez & Lattiboudere, LLC, attorneys; Cherie L. Adams, of counsel and on the brief; Leslie F. Prentice, on the brief).

The opinion of the court was delivered by

FUENTES, P.J.A.D.

Plaintiffs S.T. and N.T. are the parents of S.T. (Samuel), a special needs child who has been diagnosed with autism and related cognitive, social, and behavioral difficulties. On May 2, 2011, plaintiffs filed a petition against the Jersey City Board of Education (Board) with the State Commissioner of Education, on behalf of their son Samuel, who was then seven years old. Plaintiffs alleged the Board had violated Samuel's right to a "free appropriate public education" under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C.A. § 1400 to 148.

The Commissioner referred the petition to the Office of Administrative Law for a due process hearing before an Administrative Law Judge (ALJ). On August 11, 2011, plaintiffs' counsel apprised the ALJ that the parties had executed a Stipulation of Settlement and Release with the Board. In an order dated September 8, 2011, the ALJ found the parties voluntarily agreed to abide by the Stipulation of Settlement and Release attached, which "fully disposes of all issues in controversy between them and is consistent with the law."

2

On May 11, 2016, plaintiffs filed a civil action in the United States District Court for the District of New Jersey, claiming defendant violated the IDEA by failing to comply with the Settlement Agreement the parties reached in 2011. In a sua sponte order dated September 14, 2016, supported by a memorandum of opinion, the District Court Judge dismissed plaintiffs' complaint for lack of subject matter jurisdiction. The Judge found plaintiffs' complaint alleged facts that sought relief based on common law breach of contract.

On November 5, 2016, plaintiffs filed a civil action in the Law Division alleging the Board breached the Settlement Agreement and sought $88,000 in compensatory damages, representing the cost to transport Samuel to and from the school he attended, $20,000 in consequential damages for the time Samuel's mother spent in accompanying her son to and from school, and counsel fees and costs. The relevant timeframe used by plaintiffs to determine the measure of damages was September 2011 to May 2016.

On September 13, 2018, a civil jury returned a verdict in plaintiffs' favor. The jury found: (1) defendant breached the Stipulation of Settlement by not providing transportation to Samuel to and from school; (2) defendant did not prove plaintiffs waived the right to transportation under the parties' contract; and (3) plaintiffs were entitled to $2,280 in compensatory damages.

In this appeal, plaintiffs argue the trial judge erred when he denied their motion for a new trial, or alternatively for an additur, and in denying their motion for an award of counsel fees. We disagree and affirm.

I

Samuel was fourteen years old at the time of the trial. He had attended P.S. 31 in Jersey City between 2009 and 2010. In June of 2010, his parents began homeschooling Samuel for six months, using a program that was approved by the Board. Samuel's father S.T. testified that he and his wife decided homeschooling was the proper approach to deal with the inadequate education his son was receiving at P.S. 31. He provided the following explanation in support of this decision:

> There were many issues. There was aid. Even [the Board] agreed that, you know, the teachers agreed [Samuel] is not making any progress. And those are – he used to say one word only. That was his only communication, only saying one word, I want – he would say one water. He will say water. He'll say cookie. These are the two words he used to speak those days in my mind that's all.

S.T. testified that before he removed his son from P.S. 31, he and his wife requested the Board refer Samuel to an appropriate program. Although the Board referred Samuel to the Epic School and Garden Academy, S.T. testified those two programs did not accept his son. In response, the Board recommended

4

that Samuel continue to attend P.S. 31. This prompted plaintiffs to file the due process hearing petition to protect and enforce their son's right to a free, appropriate education. In the petition filed on May 2, 2011, plaintiffs requested that Samuel receive specialized out-of-district schooling for children on the autism spectrum, and reimbursement for expenses incurred in homeschooling Samuel.

Paragraph Three of the Stipulation of Settlement Agreement provided that "[f]rom September 6, 2011, . . . the [Board] will place [Samuel] at Caldwell College's Center for Autism and ABA[.]" Paragraph Four stated: "The District will provide transportation to and from Caldwell[.]" Paragraph Eight provided:

> This Agreement constitutes a full and final settlement as to the claims set out in the Petition, and all possible claims under federal and state laws, and constitutes a knowing waiver of any right to bring any claims arising out of the terms of this Stipulation, except for its enforcement.

The Settlement Agreement did not include any admission of liability by the Board. S.T. confirmed at trial that he understood that none of the parties were admitting fault by entering into the Settlement Agreement. Of particular relevance here, the Settlement Agreement did not include a provision that authorized the court to award counsel fees to the prevailing party in any potential enforcement action.

S.T. testified that he was apprehensive about the Board's willingness to comply with the terms of the Settlement Agreement from the start. On September 1, 2011, he left a voicemail with his son's case manager reminding her of the Board's obligation to take Samuel to and from school starting on September 6, 2011. Despite his preemptive measures, S.T. testified that "unfortunately" the Board did not honor its responsibilities under the Settlement Agreement. S.T. claimed he did not contact anyone in the school district to complain about these problems because his attorney had already sent a letter to the Board.

However, on cross-examination, S.T. conceded: (1) that his attorney represented him only through 2012; and (2) he did not contact the Board about Samuel's transportation until 2016. At one point, the Board's counsel asked S.T. to explain "why you didn't follow due process here and file a lawsuit?" This prompted the following response:

> So first thing it was – we already came out of the last suit, and it was very, very financially, emotionally taxing on our family life. Those days were very, very bad for us, like, I'm reliving those days right now. And . . . and on . . . top of it . . . I was providing the transportation, I was spending sixteen hundred dollars on an average every week. How will I have the money to go file that again and start fighting the case again. I knew that fighting with [the Board] is going to consume

lot of my money and resources and my energy for my family.

It's been two-and-a-half years now, right, since we've . . . been to the [c]ourt, and we are still going onto the process. I have spent thousands of dollars on it.

The Board called the school district's Supervisor of Special Education, Karen Gullace, as a witness. Gullace began working for the Board in 2011 as a special education teacher and was promoted to Supervisor of Special Education. She had worked for the Board in this capacity for the last nine and a half years. Her duties included "oversee[ing] the compliance of students' individual education plans, that they're being adhered to properly, that they're receiving services[.]" She was also responsible for "all due-process cases for the district."

Gullace testified that in 2011, Samuel's parents refused the Board's offer to transport Samuel to the school. Plaintiffs did not request transportation for the remainder of the 2011-2012 school year, the 2013-2014 school year, the 2014-2015 school year, and part of the 2015-2016 school year. Gullace elaborated on this issue in response to the following questions from defense counsel:

Q: Ms. Gullace, to your knowledge did the district provide transportation to the plaintiff in 2011?

A: The district offered transportation and the parent refused.

7

Q: Thank you. What is your understanding of why the parents refused?

A: Because . . . they wanted the mother to ride the bus with the student.

Q: Okay. Now let's go back to generalizations here. Does the district provide transportation to and from school for parents of students?

A: We do not.

Q: Okay. And why is that?

A: It's a liability and an undue burden on taxpayers.

Q: Okay. Thank you. Also speaking generally, when you're arranging transportation for students with special needs, are there aides on those buses?

A: There are.

Q: Okay. And are those aides trained?

A: Yes.

Q: And is it your understanding that those aides are paid on a per diem rate?

A: It is.

Q: Okay. Thank you. In this case, getting back to specifically the student here, when would the transportation have been arranged to begin if it were to begin for the 2011/2012 school year?

A: It would have been arranged in September of 2011.

8

The appellate record also includes Samuel's case notes from September 22, 2011, which state: "9/22/11 2pm Called [phone number] Mr. [T] stated that family will provide transportation to/from clinic in order for parent to accompany student. Parent refused district transportation CM asked Mr. [T] to contact the transportation department . . . in order to discuss reimbursement requirements."

Despite this evidence, plaintiffs claimed that between 2011 and 2016, they were obligated to provide transportation for their son because the Board refused to honor its obligation under the Settlement Agreement. S.T. testified he hired four taxi drivers to take his son to and from school. He claimed he found these drivers through Craigslist, word-of-mouth, and a taxi company. He paid each driver between $95 and $120 per day.

In response to defense counsel's questions on cross-examination, S.T. could not provide the addresses for any of the drivers, did not know two of the drivers' last names, could not recall the name of the taxi company who employed one of the drivers, was unable to provide timelines for the drivers who worked for him, and was unable to produce any documentary evidence of the services provided by these alleged drivers over the relevant five-year period. S.T. was only able to produce five checks that he wrote for one alleged driver.

9

S.T. testified he paid approximately $88,000, mostly in cash, to transport his son to school over a five-year period. The only documentary evidence plaintiffs produced to support this claim were five checks totaling $2,280 for taxis services provided between November 2011 and December 2011. S.T. provided the following explanation for how he arrived at $88,000:

> So the way . . . I was doing it, I think it's in 2012 in April there were two drivers left, and both were charging $100. So . . . I don't have to pay for anything else other than how many days my son is absent from the school. So that was the one which I was tracking it. My son is now severe[ly] sick, he's not going to school, I track it that he's not going to school. And most of the days he was going to school. So that's how I used to calculate and, you know, sum my expenses.

Plaintiffs' measure of damages also included N.T.'s services, in the form of accompanying her son to and from school. Plaintiffs valued this service at approximately $20,000. S.T. reached this figure by multiplying the hours his wife spent accompanying their son by the minimum gross hourly rate. S.T. testified N.T.'s services were necessary

> because my son's behaviors are very, very – he can be very terrible some days. So he can approach the driver, he still does it. If you are sitting in the car, (indiscernible), if you're in a car he can reach the driver and, you know, hurt him or he can open the door. He can open the windows. Someone needs to be around him to make sure that he doesn't do any of those things.

A-2245-18T2

> If . . . he's trying to hurt [the] driver, he's trying to hurt
> the driver without my wife, so everybody will be safe.

On cross-examination, S.T. conceded that the Settlement Agreement did not require the Board to allow N.T. to accompany their son, nor provide for N.T. to be paid for her time at a minimum hourly rate. Finally, S.T. testified that he's had a car and a driver's license since 2013. However, he did not make any attempt to transport his son to school during this relevant time period.

John Zupko, the Board's Transportation Coordinator, testified that there are two situations in which the school district would reimburse parents for the cost of transportation: (1) students attending private schools and (2) special-needs parents who enter into parental transportations contracts. Although parental transportation contracts are negotiable, Zupko made clear compensation is based on "a per mileage rate." The State mileage rate at the time was thirty-eight cents per mile. Furthermore, parents were not permitted to make their own private transportation arrangements.

According to S.T., the first time the Board provided Samuel transportation to and from school was on June 2, 2016. This occurred only after plaintiffs' attorney filed the IDEA action in the District Court. S.T. testified that on May 25, 2016,

the bus company called at my home, and the driver who has accent from different country and he said he's . . . . My wife told me that somebody called . . . her from the bus company telling her that this person Paul is going to be picking up my son tomorrow morning.

S.T. claimed he and his wife were concerned about the authenticity of the caller because they had not been contacted by a representative of the Board. The caller only identified himself as being from the bus company.

It was the bus company told us that okay, I'm going to come and pick up [your] son. And knowing that my son is having those disabilities where, you know, if I leave him around . . . around our house, he can't come back to house. How can I leave him . . . with someone else whom I have no, you know, verification[.] . . . [H]ow would I know that this is a genuine person?

S.T. also testified that he was concerned about the aide who was required to be on the school bus to ensure the safety of his special needs son:

And does the person who is be – as an aide, aide must be able to communicate with my son. Does the aide understand English or not? Does aide is properly trained [sic]. And on the top of it, is there any way . . . my wife can transition that knowledge which she has it in, you know, where she tells them that okay how to handle my son if he is aggravated, if he is trying to hurt himself or hurt someone else, how to handle that.

S.T. testified that after he received this telephone call, he contacted his attorney to determine whether this was a legitimate call from the school district. He also wanted the school district to provide some kind of transition plan. S.T.

12

also called the Board's transportation department and the Special Education Supervisor Karen Gullace. Although S.T. wanted his wife to help transition his son, Gullace told him that N.T. could not ride on the school bus with Samuel. The matter was eventually ostensibly resolved. On June 2, 2016, Samuel resumed going to school using transportation provided by the Board. He missed only a few school days from May 26 to June 2, 2016.

Gullace testified that in May 2016, the Board received a request for Samuel's transportation from his parents' attorney. However, when the school bus arrived to pick up Samuel, his mother insisted on accompanying him on the bus. When the school bus driver denied her request, the mother refused to permit Samuel to board the bus.

## II

The jury trial began on September 12, 2018 and ended on September 17, 2018. The jury returned a verdict in plaintiffs' favor. By a vote of five-to-one, the jury found: (1) plaintiffs proved by a preponderance of the credible evidence that the Board breached the Stipulation of Settlement by not providing Samuel transportation to and from school; and (2) the Board did not prove by a preponderance of the credible evidence that plaintiffs waived their right to transportation under the parties' contract. By a vote of six-to-zero, the jury

found plaintiffs proved by a preponderance of the credible evidence that they suffered monetary damages specifically due to the Board's breach of contract. The jury awarded plaintiffs $2,280 in compensatory damages. The trial judge denied plaintiffs' motion for new trial or, alternatively, additur. The judge also denied plaintiffs' motion for costs and attorneys' fees.

"[A] trial judge should not interfere with the quantum of damages assessed by a jury unless it is so disproportionate . . . as to shock [the judge's] conscience and to convince him that to sustain the award would be manifestly unjust." Baxter v. Fairmont Food Co., 74 N.J. 588, 596 (1977). Therefore, "the judge cannot validly intrude unless 'it clearly and convincingly appears that there was a miscarriage of justice under the law.'" Ibid. (quoting R. 4:49-1).

We review the trial judge's ruling by applying the same legal standard. However, we "must take allowance for factors which were evident to the trial court and jury but which cannot be gleaned from the written record." Fritsche v. Westinghouse Electric Corp., 55 N.J. 322, 330 (1970); see also Dolson v. Anastasia, 55 N.J. 2, 7 (1969). Unlike the trial court, "[a]n appellate court is unable to get the 'feel for the case' and lacks the opportunity to observe and hear witnesses who appear before the trial judge and jury[.]" Fritsche, 55 N.J. at 330.

Plaintiffs argue the jurors' damage verdict is a miscarriage of justice because they improperly limited the award to documented costs.  According to plaintiffs, the jury verdict cannot stand because they made reasonable efforts to mitigate damages.  The Board argues that plaintiffs' arguments overlook the jury's basic function to make its own credibility determinations.  The Board urges us to uphold the jury verdict because it was grounded on the proof presented by the parties.

We agree with the Board's position.  Juries have broad latitude to determine damages.  The standard for granting a new trial is therefore necessarily high.  Johnson v. Scaccetti, 192 N.J. 256, 281 (2007).  Rule 4:49-1(a) provides that "[t]he trial judge shall grant the motion if, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a miscarriage of justice."  See also Rule 2:10-1.

Generally, "[a] jury's verdict, including an award of damages, is cloaked with a 'presumption of correctness.'"  Cuevas v. Wentworth Group, 226 N.J. 480, 501 (2016) (quoting Baxter, 74 N.J. at 598).  This is because "'[o]ur civil system of justice places trust in ordinary men and women of varying experience and backgrounds, who serve as jurors, to render judgments concerning liability and

damages.'" Orientale v. Jennings, 239 N.J. 569, 589 (2019) (quoting Johnson, 192 N.J. at 279). Therefore, in deciding whether to grant a motion for new trial or additur, "the court must give 'due regard to the opportunity of the jury to pass upon the credibility of the witnesses.'" Cuervas, 226 N.J. at 501 (quoting He v. Miller, 207 N.J. 230, 248 (2011), overruled by Cuervas, 226 N.J. 480). "The jury's views of the facts and the credibility of the witnesses as expressed in its verdict are entitled to deference from both the trial and appellate courts." He, 207 N.J. at 252.

Here, there is no factual or legal basis to find, by clear and convincing evidence, that the jury verdict was a miscarriage of justice. The jury made a credibility determination and found $2,280 was the amount that properly compensated plaintiffs for the breach of this contract. We discern no basis to interfere.

Finally, there is no legal basis to grant plaintiffs' motion for an award of counsel fees. The trial court properly concluded that the Settlement Agreement did not have any provision for attorneys' fees to a prevailing party in an enforcement action. Under these circumstances, the "American Rule," which provides "the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser," prevails. Redine v. Pantzer, 141 N.J. 292, 321-

22 (1995) (quoting <u>Alyeska Pipeline Serv. Co. v. Wilderness Society</u>, 421 U.S. 240, 247 (1975)).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2245-18T2